AO 91 (REV.5/85) Criminal Complaint

AUSA Amarjeet S. Bhachu (312) 469-6212
AUSA Diane Macarthur (312) 353-5352

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**FILED**

OCT 26 2012
10-26-12

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

STEVEN MANDELL,
formerly known as, "Steven Manning," and
GARY ENGEL

CRIMINAL COMPLAINT

CASE NUMBER:

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

12 CR 842

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

## Count One

Beginning no later than in or around September 2012 and continuing through October 25, 2012, in the Northern District of Illinois, the defendants did knowingly conspire to commit extortion, as that term is used in Title 18, United States Code, Section 1951(b)(2), which extortion would have affected commerce, as that term is used in Title 18, United States Code, Section 1951(b)(3), and which conspiracy consisted of obtaining property, namely United States currency and real property, from Business 1, and from the owner of Business 1, with the owner's consent to be induced by the wrongful use of actual and threatened force and violence and fear, in violation of Title 18 United States Code, Section 1951.

## Count Two

Beginning no later than in or around September 2012 and continuing through October 25, 2012, in the Northern District of Illinois, the defendants did knowingly attempt to commit extortion, as that term is used in Title 18, United States Code, Section 1951(b)(2), which extortion would have affected commerce, as that term is used in Title 18, United States Code, Section 1951(b)(3), and which extortion consisted of attempting to obtain property, namely United States currency and real property, from Business 1, and from the owner of Business 1, with the owner's consent to be induced by the wrongful use of actual and threatened force and violence and fear, in violation of Title 18 United States Code, Section 1951.

I further state that I am a(n)  Special Agent, Federal Bureau of Investigation  and that this complaint

is based on the following facts:

**See attached affidavit.**

Continued on the attached sheet and made a part hereof:  _X_ Yes      ____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

October 26, 2012                                          at        Chicago, Illinois
Date                                                                         City and State

Geraldine Soat Brown
*United States Magistrate Judge*                                 Signature of Judicial Officer
Name & Title of Judicial Officer

STATE OF ILLINOIS    )
                       )   SS

COUNTY OF COOK    )

## AFFIDAVIT

      I, RICHARD J. TIPTON, being duly sworn on oath, state as follows:

## I.   Preliminary Matters

      1.    I am a Special Agent with the FBI and have been employed by the FBI since May 2002. In connection with my official FBI duties, I have investigated, among others, cases involving conspiring and attempting, by extortion, to obstruct and affect commerce, in violation of Title 18, United States Code, Section 1951. Over the previous ten years I have also been involved in various types of electronic surveillance, as well as in the debriefing of defendants, witnesses, informants and others who have knowledge of criminal activities.

      2.    I have been involved in the investigation of STEVEN MANDELL, formerly known as "Steven Manning" (hereinafter, "MANDELL"), and GARY ENGEL concerning their involvement in violations of federal law, including violations of Title 18, United States Code, Section 1951.

      3.    The information contained in this Affidavit is based on my participation in this investigation; my conversations with and review of reports prepared by agents in the FBI; the results of physical surveillance; agents' review of recorded conversations; National Crime Information Center arrest history records; my training and experience; and the training and experience of other law enforcement officers I have consulted. Since this Affidavit is being submitted for the limited purpose of

establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4.  This Affidavit is made for the purpose of establishing probable cause in support of a complaint charging STEVEN MANDELL and GARY ENGEL with conspiring and attempting, by extortion, to obstruct and affect commerce, in violation of Title 18, United States Code, Section 1951.

5.  Reference is made to lawfully recorded conversations in this affidavit. In certain instances, these conversations are summarized and placed in context. My understanding of these conversations (which often appears in brackets) is aided by the content and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of the investigation. The times listed for the recorded conversations are approximate. Further, summaries of the recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals. Certain of the conversations herein were lawfully video recorded. References in this affidavit are made to recorded video only when necessary to explain and lend context to the conversation.

2

## II.  Summary of Probable Cause

6.  STEVEN MANDELL[1] had multiple recorded discussions with Individual A that concern the abduction, extortion and murder of Victim 1, who operates a business, Business 1.  In these discussions, MANDELL solicited Individual A's assistance in the planned abduction, extortion and murder of Victim 1. MANDELL selected Victim 1 as a target owing to Victim 1's perceived access to large

---

[1]  Arrest history records reflect that STEVEN MANDELL has two convictions. First, in approximately 1983, MANDELL (then known as STEVEN MANNING) pled guilty to criminal charges relating to an insurance fraud scheme. MANDELL received a term of periodic imprisonment and 30 months probation for this offense. (MANDELL was employed as a police officer with the Chicago Police Department for approximately ten years until his resignation in 1983.) Second, in approximately 1987, MANDELL (then known as STEVEN MANNING) was convicted of burglary and was sentenced to a term of 4 years in prison. MANDELL (then known as STEVEN MANNING) was formerly prosecuted for first degree murder by the State of Illinois. MANDELL was convicted and sentenced to death. His conviction was reversed by the Illinois Supreme Court. *See People v. Manning*, 695 N.E.2d 423, 432-34 (1998) (conviction remanded for retrial based on two grounds: (1) improper admission of evidence at trial that MANDELL (then known as STEVEN MANNING) arranged for false alibi in his case and (2) improper admission of statement murder victim made to his wife: "Jimmy had told me the last time I saw him that if he turns up dead, that I should go to the [FBI agent] and tell him Steve Manning killed him."). MANDELL (then known as STEVEN MANNING) was also formerly prosecuted for kidnapping by the State of Missouri. MANDELL was convicted, and sentenced to an effective term of life imprisonment. His conviction was reversed by the United States Court of Appeals for the Eighth Circuit on habeas review. *Manning v. Bowersox*, 310 F.3d 571, 575-76, 578 (8th Cir. 2002) (granting habeas relief because government informant elicited statements from MANNING concerning a false alibi after sixth amendment right to counsel had attached). Neither the State of Illinois nor the State of Missouri elected to retry MANDELL. As recounted in *Manning v. United States*, 546 F.3d 430 (7th Cir. 2008), after these convictions were reversed on appeal, MANDELL sued two FBI agents and the United States on the grounds that the two FBI agents had framed him for these crimes. A jury in this district found for MANDELL on *Bivens* claims against the agents (concerning the fabrication of evidence and concealing the fabrication of evidence from prosecutors) and awarded him $6.5 million. Subsequently, the district court concluded that there was probable cause to prosecute MANDELL for murder and kidnapping absent the questioned evidence, ruled against MANDELL on his Federal Torts Claim Act ("FTCA") claims against the United States, and thereafter vacated the *Bivens* judgment based on the statutory bar arising from the FTCA judgment. The district court's decision was affirmed by the Seventh Circuit.

3

amounts of cash arising from, among other things, Victim 1's commercial real estate holdings. MANDELL discussed luring Victim 1 to Individual A's workplace, after which MANDELL, while posing as a law enforcement officer, planned to abduct Victim 1, take Victim 1 to an office space (which was referred to by MANDELL in coded conversation as "Club Med"), where actual and threatened force, violence and fear were to be used to make Victim 1 transfer Victim 1's property to MANDELL, such as bulk quantities of cash and real estate.

7.    In connection with this extortion, MANDELL worked together with GARY ENGEL.[2] MANDELL explained to Individual A that he had an "associate" [ENGEL] who would assist MANDELL in connection with the abduction of Victim 1, and that his associate would also participate in the extortion of Victim 1 at "Club Med." MANDELL and Individual A discussed the fact that Victim 1 liked meeting on Thursdays. Prior to the planned abduction of Victim 1, on or about October 23, 2012, October 24, 2012, and October 25, 2012, MANDELL and ENGEL met at "Club Med,"

---

[2]    ENGEL was previously employed as a police officer with the Willow Springs Police Department in the 1970s. Arrest history records reflect that ENGEL has multiple prior convictions, to include the following: ENGEL was arrested in 1970 for unlawful use of a weapon and sentenced to one year of probation. ENGEL was arrested in 1979 for unlawful use of a weapon, pleaded guilty. The sentence as to this offense is unclear from criminal history records currently available. In 1988, ENGEL was sentenced to a term of imprisonment of three years for burglary, attempted burglary and possession of burglary tools. ENGEL has multiple prior arrests for impersonating a police officer. ENGEL was formerly prosecuted in 1991 for kidnapping and armed criminal action by the State of Missouri, and sentenced to a term of ninety years in prison (this prosecution was related to the kidnapping prosecution of MANDELL). ENGEL's conviction was reversed on habeas review by the Supreme Court of Missouri on grounds the State had failed to disclose impeachment material concerning a prosecution witness. *State ex rel. Engel v. Domire*, 304 S.W.3d 120 (Mo. 2010). The State of Missouri did not elect to retry ENGEL on these charges.

4

which is located on the Northwest side of Chicago, Illinois. Their meetings at "Club Med" were recorded. At that time, MANDELL and ENGEL planned how they would pose as police officers to abduct Victim 1, how they would restrain Victim 1 at "Club Med," and how Victim 1's body would be dismembered after the extortion and murder of Victim 1.

8.     On the evening of October 25, 2012, MANDELL and ENGEL were arrested after they traveled to the vicinity of Individual A's workplace, the location of the planned abduction of Victim 1. Both MANDELL and ENGEL had multiple false law enforcement identifications on their person, as well as "prop" firearms. ENGEL was in possession of a pair of handcuffs, while MANDELL had in his possession a forged warrant naming Victim 1 as a defendant. A subsequent search of "Club Med" resulted in, among other things, the discovery of a loaded firearm, ammunition, a butcher knife and saws suitable for the dismemberment of Victim 1, and multiple zip-ties and anchors that could be used to restrain Victim 1.

III.   <u>Facts Establishing Probable Cause</u>

A.     MANDELL Plans the Abduction and Extortion of Victim 1.

9.     On or about September 22, 2012, at approximately 8:32 a.m., STEVEN MANDELL met with Individual A at Individual A's workplace. This meeting was recorded. During the meeting, MANDELL discussed his plan to abduct Victim 1. MANDELL said to Individual A: "With uh Soupie, Soupie Sales?" [MANDELL was referring to Victim 1, his intended victim.] MANDELL asked: "This is about a week away?" [This meeting was video recorded. MANDELL indicated with his hands as if

they were holding bars.] [MANDELL was asking if a location that would be used to abduct and hold Victim 1 would be ready within a week.] MANDELL said to Individual A: "Then you can make your first beautiful established meeting with what's his name. . . . Soupie. . . . Soupie Sales." MANDELL was then observed mouthing on the video recording (in an effort to conceal what he was saying) the last name of Victim 1.

10.    On or about September 27, 2012, MANDELL met with Individual A at Individual A's workplace. This meeting was recorded. During the meeting, MANDELL made reference to "Soupie Sales" and then said: "You're going to like that. It's going to bond us real well." [After working together to abduct Victim 1, MANDELL and Individual A would be close.] Individual A said: "Oh, we got a partner . . . the partner don't know about me." [Individual A referenced the fact that a third individual would assist in the extortion of Victim 1.] MANDELL responded: "Never will." Individual A replied: "And I don't know him." MANDELL responded: "Never will." [MANDELL indicated that the identity of this third individual, ENGEL, would not be disclosed to Individual A.]

11.    On or about September 30, 2012, at approximately 7:51 a.m., MANDELL met with Individual A at Individual A's workplace. This meeting was recorded. During the meeting, Individual A and MANDELL discussed the murder of another individual, Victim 2, and the plans to abduct and extort Victim 1. Individual A asked MANDELL: "What's our plans for [first name of Victim 2]?" MANDELL responded: "Boom boom. It's all over the news." [Victim 2 will be shot to death and there will be

6

extensive media coverage.] Individual A replied: "And what about the money? Fuck the money? Fuck Club Med? Just boom boom?" [Individual A asked if the location referred to as "Club Med" would be used in connection with the murder of Victim 2.] MANDELL replied: "Club Med is just Club Med, for whatever may have to happen. First of all Soupie Sales, Soupie Kitchen, that's Club Med." [MANDELL explained that "Club Med" would be used for the extortion of Victim 1 (referred to as "Soupie Sales" and "Soupie Kitchen").]

12.     Thereafter, MANDELL explained how he would abduct Victim 1 from Individual A's workplace by posing as a law enforcement officer. Specifically, MANDELL can be observed referring repeatedly to a diagram MANDELL has drawn on a piece of paper.[3] MANDELL said: "Once he comes here, either here or here, he'll have his phone, and he's going to meet you. It's your decision. I can walk in here, or if you don't want to be bothered by none of it, catch him out there." [MANDELL explained that he could abduct Victim 1 either in Individual A's office, or outside Individual A's office.] MANDELL explained what he would say to Victim 1 while pretending to take him into custody: "All that shit has caught up to you buddy." Thereafter, MANDELL said: "From here, I'm going to leave his car here and phone in the parking lot, just the way it was. Going to go over here, I'm going to deposit him over here with my associate. My associate will keep him there. I am going to – you will not leave until I tell you to leave, okay? Now, when I come back, I'm taking his car, and his phone, and I am immediately going this way. Boom boom boom boom

---

[3]     This meeting was video recorded.

boom boom boom boom boom boom boom boom. Got it?" MANDELL continued: "This is the science though. Fifteen minutes after he leaves, and he's making phone calls, going home, you're closing up, and you're calling home too . . . . that's what happened on October 1, at approximately 6:30 at night. Records show that. And in the meantime, for the next 7 days, boom boom boom boom boom boom boom. (Inaudible) has him at his garage." [MANDELL indicated that he would take Victim 1 to the location previously referred to as "Club Med," where MANDELL's confederate, ENGEL, would hold Victim 1 captive. MANDELL would leave Victim 1's car and cellular telephone in the vicinity of Individual A's workplace. After leaving Victim 1 with his associate at "Club Med," MANDELL would return from "Club Med," and drive Victim 1's vehicle, with Victim 1's cellular telephone, to Victim 1's residence. During the trip, Victim 1's cellular telephone would reflect its movement to Victim 1's residence through its communication with cellular towers (referred to in the conversation as "boom boom boom boom"), thus providing Individual A with an alibi, in that law enforcement would later believe that Victim 1 had left Individual A's office and was at home before disappearing.]

13.     Individual A asked about one aspect of the plan Individual A did not understand: "He's here at Club Med, with your associate. How do you know he's telling you where the money is?" [Individual A asked how MANDELL would know whether efforts to extort Victim 1 were successful since MANDELL would be driving Victim 1's vehicle back to Victim 1's residence after leaving Victim 1 at "Club Med" with his associate.] MANDELL responded: "My associate's telling me." [ENGEL

would inform MANDELL whether Victim 1 was providing information concerning the whereabouts of his assets.] MANDELL assured Individual A that he would have the situation "all under control" and that Victim 1 would "spill the beans." MANDELL reiterated: "But this is critical. I want to be in his car, making calls all the way back to his house . . . the car goes back in the garage where it belongs. [MANDELL emphasized that he wanted to return Victim 1's cellular telephone to Victim 1's residence to make it seem Victim 1 had returned home after meeting with Individual A.] MANDELL said: "He'll be there [on video, MANDELL can be seen joining his hands together, to indicate they were bound, and then covering his eyes with his hands, to indicate blindfolded eyes]," MANDELL then let out several simulated cries of pain, and then said: "Give it up." [MANDELL explained Victim 1 would be bound and blindfolded, would be put in fear, and would be ordered to divulge information concerning Victim 1's assets.] MANDELL later said: "The only thing that keeps bugging me is all that property. God. Never mind, I know what you're going to think." [MANDELL wanted to seize control of Victim 1's real property as well.] Individual A suggested the effort to seize Victim 1's real property was "Stupid stupid." Individual A added: "Twenty-five properties paid for." Later, Individual A said, "I'm thinking about the property." MANDELL replied: "You make the final decision on that." [It was up to Individual A whether they would attempt to seize Victim 1's real property in addition to cash/personal property.] Individual A replied: "That's 25 pieces of property paid for." MANDELL: "Yeah, I'd like to put it in a fictitious name or shift it, that's what we thought of. But I would never do anything

9

real estate wise, that I don't know what I'm doing." [MANDELL suggested he would like to seize Victim 1's real estate and transfer it to the name of a fictitious individual in order to avoid suspicion, but was unsure how to do so.]

14.     Individual A expressed concern about the "alarm" [whether there was any alarm on Victim 1's residence that would be triggered when Victim 1's car was returned] and whether Victim 1 would tell MANDELL everything. MANDELL reassured Individual A. MANDELL whispered: "Everything." MANDELL then let out several simulated sobs/cries of pain and said: "It's pitiful. Hershey squirts up the asswad." [MANDELL advised that Victim 1 might lose composure and defecate during the extortion process.] Individual A asked MANDELL: "How much do you think he's got in the house?" MANDELL advised Individual A what he (MANDELL) expected to recover from the extortion of Victim 1: "I told you, my expect– my minimal expectations? [MANDELL referred to a paper on the desk in front of him] Minimal. That's, I mean I might even commit suicide if there's less than that. Could there be a lot more? Absolutely." Later, MANDELL asked Individual A to estimate how much cash Victim 1 generated from Victim 1's real estate properties: "If you had twenty-five of these [25 pieces of rented real estate], collecting rent. What do you think that gives him a month? You think he takes in 50, 80, 60? What do you think he makes?" Individual A expressed the belief that Victim 1 made "more," and MANDELL responded: "So you think he does a 100K a month?" [MANDELL asked if Victim 1 made more than $100,000 per month from commercial activities.] Individual A agreed. MANDELL observed: "He's always been a cash guy."

**B.**    **MANDELL Visits the Extortion Location Referred to as "Club Med" and MANDELL Requests Certain Renovations for Use in Connection with the Extortion of Victim 1.**

15.    On or about October 4, 2012, MANDELL and Individual A traveled to a vacant office space located on the Northwest side of Chicago, Illinois (the "Extortion Location"), to discuss how this location would be renovated for its use in connection with the extortion of Victim 1. After arriving at the Extortion Location, Individual A and MANDELL discussed the renovation of the Extortion Location.[4] This meeting was recorded. Individual A asked for "direction" from MANDELL. MANDELL specified that he wanted the Extortion Location to be outfitted with a big sink, like "an old fashioned laundry room with two deep (inaudible)." I believe, based on the investigation to date and the discussion referenced in this paragraph and paragraph 17 below, that MANDELL wished to have a large double sink placed within the Extortion Location so that it could be used in connection with the extortion of Victim 1. MANDELL also asked for the installation of a counter in the Extortion Location that was "easy to clean, where it's heavy for weight, so you could put a couple hundred pounds on there." MANDELL added: "As long as it can handle the weight. If we put an engine block on there, two three hundred pounds, it can sustain the weight." [Because MANDELL intended to use the Extortion Location for the extortion of Victim 1, I believe MANDELL's reference to using the counter so that it can bear the weight of an engine block was pretextual (so that the renovator present during the

---

[4]    Also present at was at least one worker working on the renovation of the location, who can be heard participating in the conversation about the proposed renovations.

11

conversation would not grow suspicious), and that MANDELL intended to use the counter in connection with the extortion of Victim 1.] MANDELL again requested the installation of a "big sink . . . you know what I am talking about, a two compartment sink." MANDELL elaborated: "Like laundry. . . . If you're working in a big kitchen, like stainless steel. They're like two feet by two feet. Two big . . . they're like three feet deep." MANDELL said: "We can get this thing basically functioning in a week . . . and in about a month, maybe few weeks later, we can get it even, we can start adding to that. Toilet, sink, close up the drains." MANDELL also requested the installation of a shower within the Extortion Location.

16.     Thereafter, MANDELL and Individual A generally discussed plans to renovate the Extortion Location with a worker present at the Extortion Location. Towards the end of this conversation, MANDELL specified that he wanted renovations at the Extortion Location to be done in a fashion so that the Extortion Location did not attract undue attention: "Yes, you know why? Because we got a nice looking bar to the west of us, we got an Italian restaurant to the east of us, I don't want this to become a neighborhood talked about . . ." Individual A added: "What's going on here?" MANDELL added: "It looks like shit."

17.     On or about October 10, 2012, at approximately 2:50 p.m., MANDELL met with Individual A at Individual A's workplace. The meeting was recorded. During the meeting, MANDELL again discussed how the extortion of Victim 1 would progress. Specifically, MANDELL noted how much time it would take him to arrive when he was on the way "to the club" [the Extortion Location]. MANDELL then

12

referred to his associate, ENGEL, who would be situated inside the Extortion Location: "My guy knows what he's doing, he knows how to waterboard, do interrogation, psy-ops."[5]    MANDELL explained he would come back "here" [to Individual A's workplace], and then take Victim 1's phone, and then leave the vicinity of Individual A's office.    Based on MANDELL's comments and the recorded conversations referenced in paragraphs 24 and 25 below, I believe the large double sink and heavy-duty counter MANDELL asked to have installed in the Extortion Location during his visit to the Extortion Location on October 4, 2012, were designed for use in connection with the torture, extortion and murder of Victim 1.

  C.  **MANDELL and Individual A Further Discuss Plans to Abduct and Extort Victim 1.**

  18.  On or about October 14, 2012, at approximately 8:38 a.m., MANDELL met with Individual A at Individual A's workplace.    This meeting was recorded. During this meeting, MANDELL and Individual A discussed the abduction and extortion of Victim 1.    Regarding Victim 1, MANDELL asked Individual A: "Do you feel this guy's a cash player?   You think he's flush?" Thereafter, MANDELL asked: "You never know, but would you say I was right on target with this guy?"   Individual A responded: "To the bone."   MANDELL said: "Now you see why I've been working this guy hard?   This is it."   [MANDELL explained that he had been watching Victim 1 for awhile.]   Individual A responded:   "Yeah, he's got a lot of money, he's got cash."

---

[5]  I understand MANDELL's reference to "psy-ops" to mean that ENGEL has some form of training in the use of techniques designed to influence the emotions and behavior of a captor, such as Victim 1.

MANDELL replied: "Somewhere, and I'm going to find out where it's at." Individual A said: "I don't think it's going to be that difficult to find out. . . . . I just, I don't think he's got any locations other than—." MANDELL interrupted: "Oh no, he's got locations. I know more about this, let me keep my cards to my chest."

19.     Later in the conversation, MANDELL and Individual A discussed the logistics of abducting Victim 1. MANDELL said: "Start thinking about where. Right here would be perfect in my opinion." [MANDELL told Individual A to plan where Victim 1 would be prior to Victim 1's abduction.] MANDELL advised Individual A: "I've got everything set up. I would just like it in here." [MANDELL told Individual A he wants to abduct Victim 1 from Individual A's workplace.] Individual A responded: "He likes Thursdays." [Victim 1 liked to meet on Thursdays.] MANDELL replied: "Good." Individual A continued: "He's going to come here, we're going to go through the lease, and everything signed, he's going to be expecting a check, because it's going to be rented, and then, arrest him." [MANDELL, posing as a police officer, could abduct (referred to as "arrest") Victim 1 from Individual A's workplace.] MANDELL said: "Right here." Individual A confirmed: "Right here." MANDELL thereafter asked: "When is this place totally dead," and added: "But evening is better for me, it gets dark." MANDELL emphasized: "Nobody needs to be here." [No one else should be in Individual A's workplace at the time Victim 1 was abducted.] Individual A confirmed nobody would be at the workplace: "Nobody will be here . . . Why would I have a witness here, what are you kidding?"

14

20.     Individual A advised MANDELL that Victim 1's wife was dead. MANDELL responded: "No shit." Individual A advised that other than a daughter, Victim 1 had no other relatives. MANDELL expressed his excitement: "My dick is so big and hard right now." Individual A thereafter repeated: "She's dead, she's morte. There's no heir, just the daughter." [I believe Individual A advised MANDELL there was only one possible heir to the property MANDELL was going to extort from Victim 1 before killing Victim 1, because Victim 1's wife had passed away.] Later, MANDELL said: "Soupie is exactly what I thought he is, and it gets better by the minute." MANDELL asked if he (MANDELL) should have something "drafted in total advance" for Victim 1 to "sign off on with real ink." [MANDELL asked if MANDELL should draft a document in advance that Victim 1 could be forced to sign that would assist in the transfer of real property to MANDELL or his nominee.] Individual A discussed that any document transferring title of property would have to be recorded, and that questions would arise as to any delay in recording the document if it was backdated to a time before Victim 1 disappeared: "Okay, you got Soupie. He's giving the world up, right? Everything. Ten minutes, hour, whatever. He's giving it all up. He signs. You gotta record it." MANDELL responded: "Okay." Individual A continued: "What did you do, you post-dated it from a year ago, why didn't you record it for a year?" MANDELL agreed that would be a "normal question" and suggested "keeping it closer." [The document signed by Victim 1 transferring real property would be backdated to a date closer to Victim 1's disappearance.]

15

**D.    MANDELL and ENGEL Prepare the Extortion Location for the Extortion of Victim 1.**

21.    On or about October 23, 2012, at approximately 10:58 a.m., MANDELL and ENGEL entered the Extortion Location. This meeting was recorded. During this meeting, MANDELL and ENGEL discussed where Victim 1 would be restrained within the Extortion Location. Specifically, ENGEL said: "Now, let's decide, where are we going to put the uh, the anchors? Where are we going to keep 'em. Probably in this area." [This meeting was video recorded. MANDELL and ENGEL can be observed near the double sink located in the Extortion Location.] MANDELL responded: "Well then, the anchors gotta be. This will make noise." Shortly thereafter, ENGEL suggested putting the anchors in the wall or the floor. [ENGEL can be observed looking at the wall opposite the sinks and the floor of the Extortion Location.] Later, ENGEL observed one of the sinks did not have an operational drain: "This sink has no drain. Water's just going right through." MANDELL responded: "So we can't use that. Make sure the water works properly." Later, MANDELL asked: "Do you want to put two anchors back there, while we're here?" ENGEL replied: "I don't know, wh—where are we going to keep him?" MANDELL said: "We're going to keep him right here. This is the work area." ENGEL replied: "Then the anchors have to be here."

22.    Later, as MANDELL and ENGEL are observed inspecting the rear wall of the back office area, they had the following exchange. MANDELL said: "We want to be able to secure him while he's sitting down. We don't want him laying. We

16

aren't doing spread-eagle with a (inaudible) year-old. . . . We're going to keep him here. Secured to here, okay?" ENGEL said: "Yeah." ENGEL then asked what the "jagoffs [renovators] are doing in here" and what they planned on "putting in." ENGEL expressed dissatisfaction that renovations at the Extortion Location were not yet complete: "This is fucked up." MANDELL replied: "What's fucked up about it? We can get this thing done." ENGEL later said: "What do they still have to do? That's what I don't know." ENGEL complained about the state of the electrical work in the Extortion Location.

23.     On or about October 23, 2012, at approximately 5:17 p.m., MANDELL was also observed testing a walkie-talkie inside the Extortion Location. At approximately 6:58 p.m., MANDELL was observed bringing a wheelchair into the Extortion Location.

24.     On or about October 24, 2012, at approximately 9:43 a.m., MANDELL and ENGEL were observed within the Extortion Location. This meeting was recorded. During the meeting:

a.      MANDELL and ENGEL were observed within the back office area, discussing where to position Victim 1 after Victim 1 was abducted. MANDELL identified a location and said: "I think that is where the initial interrogation can happen, okay?" ENGEL suggested a location where Victim 1 should be placed within the back office area: "We should bring him in here" [ENGEL pointed to the east side of the back office area.] ENGEL added that they would "isolate him." Thereafter,

MANDELL added: "He's going to have a ski mask over his face. It's going to be darkness."

  b. MANDELL and ENGEL discussed the dismemberment of Victim 1's body after Victim 1 was killed. MANDELL and ENGEL walked to the vicinity of the double-sink and counter in the back office area, out of sight of video recording equipment. MANDELL said: "Okay, where do you want to do the deed on this guy? You want to get him up here on the counter top? You want the two by fours over here? Because we don't want to be cutting into here." [MANDELL asked if wood should be placed on the counter top, so that it would not be damaged when Victim 1's body was dismembered.] ENGEL suggested "lean him across here" and letting "him drain." [ENGEL suggested position Victim 1's dead body in such a fashion so on the counter top/sink area so that the blood could drain into the sink.] ENGEL said: "You want him to bleed out. You want to let him drain." MANDELL replied: "Correct," and added: "But as soon as he bleeds out, in about a half hour, we'll want to straighten him out." ENGEL said: "Okay." MANDELL said: "I don't want a curled body. He's going be like this then." [MANDELL indicated Victim 1's corpse would need to be straightened out after most of the blood had drained from the corpse.]

  c. MANDELL held a walkie-talkie in his hand and asked ENGEL: "How do I go to my districts on this?" [MANDELL asked how to pick up police traffic on a walkie-talkie.] ENGEL then explained to MANDELL how to use the walkie-talkie. [Police dispatch could be overheard within the Extortion Location.]

18

d.     MANDELL and ENGEL were observed handling and dividing up clothing that appeared to be still contained in its sales packaging.

e.     ENGEL asked MANDELL: "Why do you need four?" [Four telephones.] MANDELL replied: "Because there were two sets, I want to know which ones I don't have to activate. Some might be out of service, that means I gotta go activate them, put more minutes on them." [MANDELL indicated that he had several telephones available for use in connection with the planned criminal activity.]

f.     MANDELL explained to ENGEL the cover story they would use to abduct Victim 1: "He's been indicted with [name] on the indictment." [I believe MANDELL has prepared a forged indictment to show to Victim 1, in order to convince Victim 1 that MANDELL and ENGEL are police officers when they come to arrest Victim 1.] MANDELL explained to ENGEL the other parties that had been "indicted" with Victim 1.  ENGEL asked for information concerning Victim 1's vehicles, including the license plate numbers of the vehicles. [I believe ENGEL requested this information to make it appear he had access to law enforcement sensitive information, and thus lend credence to his role as a police officer.] MANDELL provided ENGEL with the home address and date of birth for Victim 1. [I believe MANDELL provided this information to ENGEL so that ENGEL could use this information as necessary when posing as a police officer.]

g.     MANDELL and ENGEL discussed and acted out how they would approach Victim 1 at Individual A's office and abduct Victim 1 from Individual A's office. MANDELL arranged the chairs within the back office area to demonstrate to

19

ENGEL how Individual A's office was laid out. MANDELL then explained how he and ENGEL would approach Victim 1 while Victim 1 was seated in Individual A's office. As they discussed their plan, ENGEL said: "I think we should have decent looking cuffs." MANDELL said he would "pick them up." MANDELL said: "We're going to cuff him up, we'll do our speech. It can take one minute, it can take five." ENGEL indicated he wanted to pat down Victim 1 to make sure Victim 1 didn't have a "piece" [firearm]. MANDELL told ENGEL: "Do what you do as a cop." ENGEL asked if Victim 1 would be cuffed in the front or behind, and MANDELL said: "Behind him." MANDELL and ENGEL discussed that it would be dark out when they emerged with Victim 1 from Individual A's office.

   h. MANDELL and ENGEL discussed how to respond if they were stopped by law enforcement on the drive to the Extortion Location. MANDELL suggested that they pretend to be U.S. Marshals, and that ENGEL drive the vehicle, because ENGEL was "drier" than MANDELL was. MANDELL said: "I will be in the back seat with him, I want to control him." MANDELL said: "He will hear 16 and 17 blaring." [Victim 1 would be able to hear police radio traffic in the vehicle Victim 1 would be transported in.]

   i. MANDELL and ENGEL discussed what would happen to Victim 1 once they arrived at the Extortion Location. MANDELL, said: "We get him out here, we secure him right there [MANDELL pointed in the direction of the east wall of the back office area, where a wheelchair was located.]" ENGEL suggested that Victim 1's legs could be duct-taped, while MANDELL said that Victim 1 would not be

allowed to visit the bathroom to urinate while he was restrained: "He's gotta piss, he's got a bottle. Here, piss."

   j. MANDELL and ENGEL discussed the demands they would make of Victim 1. MANDELL explained what would be said to Victim 1: "You need to come up off that money. You need at least 500 large." [Victim 1 would be told he needed to pay at least $500,000 to be released.]

  25. On or about October 25, 2012, MANDELL and ENGEL were observed within the Extortion Location. This meeting was recorded. During the meeting, MANDELL and ENGEL discussed how to dismember Victim 1. For example, ENGEL discussed how to position Victim 1's corpse in order to drain blood from Victim 1's body: "You can get him in the femoral artery and let his ass sag in the center and just let it drain." MANDELL said: "And gravity will bring it in like that." ENGEL replied: "Yep, it sure will. Let his ass sag in the middle."

  E. **MANDELL and ENGEL are Arrested During their Attempt to Abduct Victim 1.**

  26. On or about October 25, 2012, at approximately 4:50 p.m., Victim 1's vehicle was parked outside the workplace of Individual A. MANDELL and ENGEL were observed by surveillance agents leaving the Extortion Location and traveling towards Individual A's workplace. At approximately 6:00 p.m., surveillance observed both MANDELL and ENGEL in a vehicle located in the alley behind Individual A's workplace.

27.     MANDELL and ENGEL were taken into custody.  MANDELL and ENGEL had on their person a variety of fake law enforcement credentials.  For example, ENGEL had a fake Deputy United States Marshal photo credential accompanied by a badge, as well as what purported to be a Deputy Sheriff Cook County badge.  ENGEL also had in his possession a pair of handcuffs.  MANDELL was wearing a Cook County Sheriff's lanyard, with a Cook County Court Services photo identification hanging from it.  The name on this photo identification was "Robert Johnson."  MANDELL was also in possession of what purported to be a Cook County Deputy Sheriff's badge.  Also in MANDELL's possession was a fake warrant that named Victim 1 as a defendant.  The fake warrant was purportedly issued by the Honorable James B. Zagel and bore, among other things, the seal of the United States District Court for the Northern District of Illinois.  MANDELL and ENGEL both possessed what appeared to be "prop" firearms.

F.     **A Loaded Firearm, Ammunition, Anchors, Zip-Ties, a Butcher Knife and Saws are Found During the Search of the Extortion Location.**

28.     After the arrest of MANDELL and ENGEL, law enforcement agents conducted a search of the Extortion Location.  Within the Extortion Location, agents found, among other things, a Ruger .22 caliber semi-automatic pistol which was loaded with eight rounds of ammunition.  Two additional boxes of ammunition for a .22 caliber weapon were also recovered.  On the counter, along the large double-sink in the back office area (the location where MANDELL and ENGEL had earlier held discussions concerning the dismemberment of Victim 1), agents recovered a butcher knife, which

22

was located on a butcher block. Also found within the Extortion Location were saws, multiple zip-ties and anchors suitable for use as restraints.

29.     Agents confirmed through a review of information available in public databases, including Lexis/Nexis, Accurint and Choice Point Clear, Victim 1's ownership of multiple real estate properties that are believed to be commercial or mixed use properties. These properties are believed to have a commercial component to them because their addresses are associated with businesses in public databases. According to records maintained by the Illinois Secretary of State, Victim 1 is listed as the president of Business 1. I believe Victim 1, through Business 1, customarily purchases goods from interstate commerce. Specifically, Victim 1 has a customer account under Victim 1's name with Home Depot.[6] The customer telephone number on record for Victim 1's account at Home Depot is also associated with Victim 1's business, Business 1. A Citibank representative (that is familiar with Home Depot credit card accounts), advised that: (1) between the period of April 2012 - September 2012, the vast majority of the purchases made utilizing the account in Victim 1's name were made at one Home Depot location in Illinois; (2) the monthly purchases on the account averaged approximately $500; and (3) the account included purchases from the flooring, hardware, lumber, kitchen/bath and paint departments. Further, based on information provided by employees of Home Depot, law enforcement has been advised

---

[6]     Records from the Illinois Secretary of State reflect that Business 1 was incorporated in 1997 and involuntarily dissolved in 2007. However, despite its dissolution, as reflected by the information provided by Home Depot, Business 1 continues to operate as a going concern.

that Home Depot has 48 distribution centers nationwide that supply merchandise to stores. According to a manager who works at the Home Depot location in Illinois referred to above, this store receives merchandise from the 48 distribution centers, and also receives direct ship merchandise from vendors located nationwide and worldwide. Because Victim 1 operates a business that leases multiple residential and commercial properties, and MANDELL and ENGEL planned to deplete assets of Victim 1's business by seizing real property that generates revenue for the business and cash derived from this business, I believe MANDELL and ENGEL's planned extortion would deplete the assets available to Victim 1's business to purchase goods in interstate commerce.

FURTHER AFFIANT SAYETH NOT.



Richard J. Tipton
*Special Agent*
Federal Bureau of Investigation



Sworn to before me and subscribed in my presence
this 26th day of October, 2012

Geraldine Soat Brown
*United States Magistrate Judge*