UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.   12 CR 842 |
| | ) | Hon.  Amy J. St. Eve |
| STEVEN MANDELL, | ) | |
| also known as, "Steven Manning" | ) | **UNDER SEAL** |

**GOVERNMENT'S AMENDED CONSOLIDATED RESPONSE
TO DEFENDANT'S PRETRIAL MOTIONS**

The UNITED STATES OF AMERICA, by MANISH S. SHAH, Attorney for the United States, hereby submits its consolidated response to the defendant's pretrial motions.  In support of this response, the government respectfully represents as follows:

**BACKGROUND**

On March 21, 2013, a grand jury in this district returned an eight-count superseding indictment charging defendant Steven Mandell with a variety of offenses against the United States, including kidnapping conspiracy, extortion, possession of a firearm in furtherance of a crime of violence, felon-in-possession of a firearm, obstruction of justice and murder-for-hire.  R. 38.

The defendant has now filed a variety of pretrial motions, and the Court has ordered the government to respond to some of them in writing.  Each motion is discussed in turn below.

# ARGUMENT

## I. Defendant's Motion to Suppress Title III Interceptions [Docket #93, 95] Should Be Denied.

In connection with its investigation of defendant Mandell, the government submitted two applications to then-Chief Judge James F. Holderman for authorization to intercept oral communications and visual, non-verbal conduct at 5308 West Devon Avenue, Chicago, Illinois (the "Target Location"). An affidavit of FBI Special Agent Richard Tipton accompanied each application. Agent Tipton explained that Mandell planned to abduct Victim 1 and bring him to the Target Location, where Victim 1 was to be tortured until he agreed to surrender his property to Mandell. Affidavit ¶ 14, 17-26.[1] Thereafter, Victim 1 was to be killed. *Id.* ¶ 17. Mandell explained ███████████ ████████████████████████████████████ that a second individual would assist Mandell in the extortion of Victim 1 and the disposal of Victim 1's body. *Id.* ¶ 17, 21, 31. Mandell explained that he would pose as a police officer, arrest Victim 1 at ███████ ████████, and then take Victim 1 to the Target Location, where his associate would take custody of Victim 1, while Mandell would depart the Target Location to plunder Victim 1's residence. *Id.* ¶¶ 23-24, 26. However, Mandell ██████████████ ████████████████████████████ *Id.* ¶ 21.

Agent Tipton, the affiant, explained that because the unidentified co-conspirator would play a critical role in major criminal activity, he believed that Mandell and his

---

[1] The affidavit referenced herein is to the affidavit submitted in support of the application to intercept oral communications at the Target Location. The affidavits sworn out by Agent Tipton were substantially the same.

unidentified co-conspirator would meet at the Target Location in advance of the planned abduction for "the purpose of planning the commission of the Subject Offenses and familiarizing the unidentified co-conspirator with the Target Location." *Id.* ¶ 26. Specifically, the affiant believed the two would meet at the Target Location "to plan for how [Victim 1] will be brought into the Target Location, to plan for how his co-conspirator will take custody of [Victim 1] at the Target Location, to plan for how the Target Location will be used to restrain and extort [Victim 1], and to plan for how to dispose of [Victim 1's] body." *Id.*

the affiant made clear that the FBI had no intention of permitting Mandell to actually abduct Victim 1 on that day. *Id.*

On October 18, 2012, Chief Judge Holderman entered orders authorizing the interception of oral communications and visual, non-verbal conduct at the Target Location, and thereafter the FBI installed a "bug" at the Target Location. Agent Tipton's belief that Mandell and his accomplice would meet at the Target Location to plan for the abduction and murder of Victim 1 was borne out by subsequent events. As detailed in part in the criminal complaint in this case, over the course of three days – October 23, October 24 and October 25 – the FBI intercepted Mandell and Gary Engel, the man revealed through the interceptions as Mandell's accomplice, preparing the Target Location for the torture, murder and dismemberment of Victim 1, and

discussing various aspects of the planned abduction, restraint and murder of Victim 1, including but not limited to:[2]

- Where to restrain Victim 1 within the Target Location and conduct an "initial interrogation" of Victim 1, Complaint ¶ 24(a), 24(i);

- Where and how to dismember Victim 1's body within the Target Location, Complaint ¶¶ 24(b), 25;

- How the two men would pose as police officers, how they would approach Victim 1 at the time of his abduction, and how they would restrain Victim 1 at the time of his "arrest," Complaint ¶ 24(f)-(g); and

- How the two men would respond if they were stopped by legitimate law enforcement officers, Complaint ¶ 24(h).

Absent the critical evidence derived from the bug, the government would have had no direct evidence concerning Engel's knowledge of the conspiracy, Engel's understanding of his role in the planned abduction and murder of Victim 1, and the specific details of Engel's role in the torture, murder and disposal of Victim 1's body. Despite this, defendant Mandell now argues that the government failed to show "necessity" for these interceptions, and that all such interceptions should be suppressed. For the reasons discussed below, the motion should be denied.

---

[2] A variety of other specific matters concerning the means and methods of the conspiracy (and evidence concerning Engel's knowledge of them) that were not described in the complaint were also intercepted. For example, Mandell and Engel discussed: the methods of torture that might be employed on Victim 1, to include the mutilation of Victim 1's genitals; how Mandell would enter Victim 1's residence and notify Engel of his entry; using a .22 caliber firearm on Victim 1 if necessary; putting Victim 1 to "sleep" with Ambien pills if things were not "looking good"; whether Engel would kill Victim 1 before Mandell returned from Victim 1's residence (Mandell indicated his desire to be present for the murder); and how to prevent blood splatter generated during the dismemberment of Victim 1 from soaking into the walls of the Target Location.

A.    **The Government Demonstrated Necessity for the Interception of Oral Communications.**

1.    **Applicable Law**

In order to obtain authority to conduct Title III interceptions, the government must demonstrate "necessity," which requires the affidavit in support of the request for interception authority to include a statement concerning whether or not (1) other investigative procedures have been tried and failed; (2) why they reasonably appear to be unlikely to succeed if tried; or (3) reasonably appear to be too dangerous. 18 U.S.C. § 2518(1)(c). The necessity requirement is *not* intended to ensure that bugs are used only as a last resort, but rather that they are not routinely employed as the "first step" in a criminal investigation. *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006). In order to obtain an interception order, the government does not need to demonstrate that prosecution would be impossible without the evidence to be gained from a bug, nor does the government have to demonstrate that evidence possibly sufficient for indictment could not be obtained through other means. *Id.* at 763 (citing *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)). Furthermore, necessity for a wiretap order is demonstrated where investigators are "having trouble fingering other members of the conspiracy," *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991), and where the wiretap allows the government "to ascertain the extent and structure of the conspiracy." *Plescia*, 48 F.3d at 1463. The government's burden of establishing compliance with the necessity requirement is "not great," and whether this requirement has been met is considered in a practical and common-sense fashion. *Id.*

In reviewing a challenge to the necessity of a wiretap, a reviewing court applies an abuse of discretion standard, giving great deference to the determination of the issuing judge. *United States v. Zambrana*, 841 F.2d 1320, 1329-30 (7th Cir. 1988) (citations omitted); *McLee*, 436 F.3d at 763. The abuse of discretion standard is an exacting one; in order for a decision to be an abuse of discretion, a reviewing court must conclude that "no reasonable person could agree with the district court." *United States v. Doyle*, 121 F.3d 1078, 1093 (7th Cir. 1997) (citation omitted). Indeed, a court's finding that normal investigation procedures were unlikely to be successful will be upheld so long as there is a "factual predicate" to support this finding in the affidavit. *Id.* (citations omitted). After-the-fact suggestions from defense counsel as to how an investigation might have been handled are entitled to little weight in an analysis of whether the "necessity" requirement has been met. *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *United States v. Velasquez*, No. 96 CR 291, 1997 WL 564674, at *19 (N.D. Ill. Sept. 5, 1997); *United States v. Mancari*, 663 F. Supp. 1343, 1350 (N.D. Ill. 1987).

2.    **Analysis**

a.    **There was a "Factual Predicate" in the Affidavit to Support the Issuing Judge's Finding of Necessity.**

Chief Judge Holderman did not abuse his discretion in finding that the government had shown necessity for conducting interceptions at the Target Location. The issuing judge had before him the affidavit of Agent Tipton. The affiant explained that normal investigative procedures had proven successful in initiating the investigation, but certain normal investigatory tactics had been tried and had failed,

6

appeared unlikely to succeed if continued further or tried, or were too dangerous to employ.  Affidavit ¶ 45.  Indeed, as described below, the affidavit made it abundantly clear that a bug was not being used as the "first step" of the investigation, but had come only after the use of a variety of other techniques,

Moreover, the affidavit also discussed why other traditional techniques could not be effectively employed.

In describing normal investigative techniques that had been utilized during the course of the investigation, the affiant first discussed the traditional technique of physical surveillance.  Affidavit ¶¶ 47-52.  Agent Tipton explained that physical surveillance had been attempted on many occasions, and had proven valuable in verifying that another victim, Victim 2, was a target of a separate murder-for-hire plot (a crime separate from the one for which interception authority was sought).  *Id.* ¶ 47.  However, the affiant went on to explain the limitations of physical surveillance.  For example, the affiant explained that while surveillance could be used to confirm meetings between individuals, it would not be able to shed light on the purpose of such meetings.  *Id.*  Moreover, the affiant explained that a critical portion of the illegal activity under investigation was expected to take place within the enclosed space of the Target Location, which could not be subjected to effective surveillance from the outside.  *Id.*  Furthermore, the affiant also explained that prolonged surveillance of Mandell was likely to be very risky.  *Id.* ¶ 48.  Agent Tipton explained that Mandell was a former police officer, who could be familiar with surveillance techniques; the affiant explained that prolonged surveillance might therefore compromise the investigation.  *Id.*  To

support this view, the affiant pointed to several examples during the course of the investigation that demonstrated that Mandell was indeed very surveillance conscious, including Mandell's use of code words, hushed tones, and his expressed fear that a tracking device he used to follow Victim 2's wife might be discovered. *Id* ¶ 49. Moreover, the Affidavit explained that Mandell had been observed inside a Sam's Club, looking at surveillance cameras that were for sale; this led the affiant to conclude there was a risk that Mandell would install surveillance cameras in the vicinity of the Target Location, making surveillance even more risky, because Mandell would be able to perform counter-surveillance. *Id.* ¶ 50. The affiant also considered the possibility of installing a pole camera in the vicinity of the Target Location, but ruled out such an installation as too risky, because Mandell's prior experience as a police officer might assist him in detecting the use of a pole camera. *Id.* ¶ 51. Furthermore, a pole camera would be unable to properly identify items brought into the Target Location and would prove no insight into what transpired inside the Target Location either. *Id.* Finally, the affiant pointed out that physical surveillance would be "unable to establish fully the identity and role of MANDELL's conspirator," to include "the implements or methods that will be used to carry out the extortion." *Id.* ¶ 52.

The affiant explained that the issuance of grand jury subpoenas was bound to be unsuccessful, because those served would likely assert their fifth amendment privilege, and would also tip off their confederates about the government's investigation – which would cause them to be more cautious, flee, ████████████ compromise the investigation. *Id.* ¶ 53.



The affiant also explained that pen register records would be of limited evidentiary use, because they did not disclose the nature or substance of conversations, and thus could not be used to establish the totality of the conspiracy under investigation. *Id.* ¶ 56-57. The government also explained that it had obtained

authorization to use a digital analyzer device with respect to Mandell, based on the belief that Mandell was using multiple telephones to communicate with his associates. *Id.* ¶ 57. However, the government explained that while a digital analyzer device would help demonstrate who Mandell was in frequent contact with, it would suffer the same limitations of toll records in general, in that it would not reveal the nature and substance of the conversations, or whether the conversations concerned legitimate or criminal subjects. *Id.*

The affiant also ruled out interviews as a means of gathering the necessary evidence. *Id.* ¶ 58. The affiant explained that approaching the participants would fail because they would be alerted about the investigation and would invoke their right to remain silent. *Id.* Moreover, the affiant pointed out that Mandell ██████████████ ██████████ (i) how to avoid an interview with law enforcement ████████████ ██████████ ████████████ and (ii) how to deceive law enforcement if questioned. *Id.* ¶ 58 & n.31. For example, ████████████████████████ ████████████████████████████ Mandell had suggested a response to any approach from law enforcement concerning the murder of Victim 2: "'How can I help you with this bullshit? Wow he was--- this is a murder investigat--? This is critical. These are legal matters, I don't involve myself in legal matters, I have lawyers to attend to this. They'll gladly . . . handle all your questions. Now leave.' F. Lee Bailey wouldn't let you answer a question would he?" The affiant also noted that it was not possible to interview Mandell's accomplice because his identity was not known. *Id.*

The affiant discussed why the use of search warrants was unlikely to succeed. There was no indication that a search of the Target Location would result in the

discovery of weapons, and would only alert Mandell to the investigation. *Id.* ¶ 59. Moreover, any search would not yield "sufficient evidence to determine the full scope of the criminal activity and identify MANDELL's co-conspirator." *Id.*

Finally, the affiant ruled out the use of trash pulls as a means to accomplish the goals of the investigation. *Id.* ¶ 60. The Target Location was undergoing renovation, so it was not expected there would be any useful evidence in the trash at this location. *Id.* Moreover, a trash pull bore the risk of alerting the security-conscious Mandell of law enforcement activity. *Id.* The affiant also explained that a trash pull at Mandell's residence would not meet with success because among other things, Mandell lived in a multi-unit condominium where identifying his trash would be difficult. *Id.*

The foregoing makes clear that the necessary "factual predicate" for necessity was established by the affidavit, *McLee*, 436 F.3d at 763, and the issuing court did not abuse its discretion in finding necessity for the bug under the facts of this case.

Even if the showing of necessity were lacking, there would still be no basis for suppression. The agents relied in good faith on the existence of a facially valid order. Under *United States v. Leon*, 468 U.S. 897, 914-23 (1984), such good faith reliance precludes suppression of the evidence. The *Leon* good faith doctrine applies to interception orders in the same way it applies to any other search warrant. *United States v. Brewer*, 204 Fed. Appx. 205, 208 (4th Cir. 2006); *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). *But see United States v. Rice*, 478 F.3d 704, 712-13 (6th Cir. 2007).

### b.  The Defendant's Claim that the Government Failed to Demonstrate Necessity is Meritless.

The defendant argues that the requisite showing of necessity was not made, and that the oral communications and visual, non-verbal conduct intercepted at the Target Location must be suppressed.[3]  However, as an initial matter, the defendant fails to cite or apply the correct standard of review to Chief Judge Holderman's decision to authorize the interception of oral communications.  As discussed above, this Court applies an abuse of discretion standard to the issuing judge's finding of necessity; it does

---

[3]  The government notes that there are two threshold problems to the defendant's motion. First, the defendant's motion glosses over the important legal distinction between the interception of oral communications and visual, non-verbal conduct.  To the extent the defendant seeks to suppress interceptions of visual, non-verbal conduct, this claim must fail as a matter of law.  The interception of visual, non-verbal conduct is not subject to suppression under Title 18, United States Code, Section 2518.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510 *et seq.* ("Title III") applies to wire, oral and electronic communications.  *See, e.g.*, 18 U.S.C. §§ 2511 (interception and disclosure of wire, oral, or electronic communications prohibited), 2518 (procedure for interception of wire, oral, or electronic communications).  An "oral communication" refers to an "oral communication uttered by a person."  18 U.S.C. § 2510(2).  Every single Court of Appeals to consider the issue – including the Seventh Circuit – has held that Title III does not apply to video surveillance.  *See United States v. Larios*, 593 F3d 82, 90 (1st Cir. 2010) (rejecting motion to suppress video surveillance on basis of Title III) (collecting cases, including *United States v. Torres*, 751 F.2d 875, 880-81 (7th Cir. 1984)).  *See also* 18 U.S.C. § 2518(10)(a) (providing aggrieved person may move to suppress only "wire or oral communication intercepted pursuant to this chapter").  Second, the defendant must first establish that he has standing to suppress an interception.  The Fourth Amendment is "a personal right that must be invoked by an individual."  *Minnesota v. Carter*, 119 S. Ct. 469, 473 (1998). A defendant must show a violation of "his (and not someone else's)" rights in order to claim constitutional injury as a result of an illegal search.  *Id.* at 472.  It means a party against whom the unlawful search was directed, one "whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman v. United States*, 394 U.S. 165, 171-172 (1969).  Accordingly, a party only has standing to suppress an interception to the extent they were a *party* to the intercepted communication.  *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991) (citation omitted).  The government therefore objects to the defendant's blanket request to suppress any interception to the extent he was not a party to that interception.

not review the issue *de novo*. The defendant does not reference this standard of review in his motion, perhaps because it is evident that it is fatal to his claim for relief. Because the defendant does not apply the correct standard of review or argue that Chief Judge Holderman's decision was an abuse of discretion, the argument is forfeited due to the failure to develop it. *United States v. Bonsu*, 336 F.3d 582, 587-88 (7th Cir. 2003).

Applying the correct standard of review, the defendant's motion fails on the merits. The defendant argues that the bug was unnecessary because the FBI had all the details of how the crime was going to be committed, so all the FBI had to do was wait until October 25, 2012 -- the day of the planned abduction of Victim 1 -- and see who showed up at the Target Location. Motion at 6, 9. But if the government had waited until October 25 to see who showed up at the Target Location, the government would have had very little in the way of evidence in hand demonstrating the accomplice's knowledge of the planned abduction and murder of Victim 1. The affiant explained that physical surveillance of the Target Location would not permit agents to determine what was transpiring inside, and whether the activities within the Target Location concerned criminal or innocent matters. Moreover, as the affiant noted, the FBI would not actually let Victim 1 be kidnapped – so the interceptions were a truly effective means of demonstrating Engel's knowledge of all facets of the conspiracy and proving what his specific duties were to be during the course of the planned extortion, as well as determining the "implements or methods that [would] be used to carry out the extortion." Affidavit ¶ 52. Accordingly, as things stood at the time the application was submitted, the government was justified in believing that the unidentified accomplice would be able to readily defend against any extortion conspiracy charge on

the ground that he was merely present in Mandell's office space and had no idea what Mandell fully intended to do with it. Under these circumstances, any criminal agreement between Mandell and then-unknown accomplice would have been difficult to prove. The interceptions therefore served to provide critical evidence concerning the extent and nature of Engel's participation in the conspiracy. *Plescia*, 48 F.3d at 1463 ("Even if it were true that the government could have prosecuted [defendant] without the tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict these five [additional defendants], the key players in the drug ring. It would have been far more difficult or impossible to determine the extent of their involvement . . . by merely observing transactions from a distance.").

Indeed, if the government let the investigation unfold as defendant Mandell suggests in his motion– and made no effort to gather the powerful direct evidence it did through the use of the bug – then the government would have faced the risk that Mandell's accomplice would attack the government at trial for failing to demonstrate the accomplice's actual knowledge of the planned abduction, extortion and murder of Victim 1. The Seventh Circuit has made clear that the government was not required to face this dilemma; "even if the government [has] enough evidence to indict" a suspect absent a bug, this does not preclude a finding of necessity. *United States v. Campos*, 541 F.3d 735, 748 (7th Cir. 2008) (citing *McLee*, 436 F.3d at 763). As the Seventh Circuit has pointed out, "the government's burden of proof at trial is substantially higher than its burden in obtaining an indictment, and the government [is] entitled to attempt to identify the full extent of [an] organization and its operatives." *Id.* Indeed, one stated

14

reason in the Affidavit for interception was to secure "the evidence necessary to ascertain the identity of, *and prove beyond a reasonable doubt* the guilt of, the participants and co-conspirators engaged in the Subject Offenses . . . ." Affidavit ¶ 45. *See also United States v. Lovasco*, 431 U.S. 783, 795 (1977) ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."); *United States v. Hoffa*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."). The government was therefore entitled to conduct interceptions in order to "finger" Mandell's accomplice, *Farmer*, 924 F.2d at 652, and ensure it could present a strong case against that accomplice at trial. For these reasons, the issuing judge's finding of necessity under the circumstances of this case was not an abuse of discretion.

**B.     The Affidavit Did Not Contain Any Material Misrepresentations or Omissions Relating to the Determination of Necessity.**

**1.     Applicable Law**

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant may be entitled to an evidentiary hearing to challenge the veracity of an affidavit submitted in support of a search warrant. However, such affidavits enjoy a presumption of validity. *Id.* at 171. In order to be entitled to a hearing, a defendant must make a substantial preliminary showing that (1) a false, misleading or omitted statement was included in the affidavit

supporting the warrant, (2) that the affiant made the false statement intentionally or with reckless disregard for the truth, and (3) that the false, misleading or omitted information was necessary for the magistrate's finding of probable cause. *Franks*, 438 U.S. at 155-56.

However, the three elements necessary to entitle a defendant to a *Franks* hearing "are hard to prove, and thus *Franks* hearings are rarely held." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (quoting *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000)). A defendant seeking a *Franks* hearing "bears a substantial burden to demonstrate probable falsity." *Id.* The defendant must "offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) (citation omitted). A showing of "egregious errors" is necessary for a *Franks* hearing. *Maro*, 272 F.3d at 822.

Where a defendant alleges that information has been improperly omitted from an affidavit, an omitted fact is only material where it would have negated a finding of necessity. *Cf. Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (applying standard to probable cause determination). In other words, a reviewing Court must ask whether a hypothetical affidavit that included the omitted material would still establish necessity. *Id.* (citations omitted). However, it is the rare instance in which a *Franks* hearing is merited by an omission. *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998). This is "because an allegation of omission 'potentially opens officers to endless conjecture about investigative leads, fragments of information or other matter that might, if included, have rebounded to defendant's benefit." *United States v. Atkin*, 107 F.3d 1213,

16

1217 (6th Cir. 1997) (citing *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). An omitted fact that is potentially relevant, but not dispositive, is insufficient to warrant a *Franks* hearing. *Colkley*, 899 F.2d at 301.

### 2. Analysis

The defendant argues repeatedly that the affidavit contains factual inaccuracies as it relates to the discussion of necessity. But for the most part (with the exceptions we discuss later), the defendant does not point to specific factual inaccuracies in the affidavit. Rather, he complains about the *ultimate conclusions* the agent drew from the facts that were fully presented to the issuing judge.

Take, for example, the defendant's discussion of physical surveillance. The defendant disagrees with Agent Tipton's statement that physical surveillance was not likely to succeed because "agents knew where the contrived crime was to take place." Motion at 9. But the affiant had disclosed to the issuing judge that he knew where both the abduction and torture were going to occur, and that the FBI was in control of when the attempt would take place. Affidavit ¶ 23-24, 26, 32 & n.21. The affiant did not omit any facts concerning the affiant's knowledge of the planned abduction of Victim 1.

The same is true for the agent's statement concerning the use of grand jury subpoenas. The defendant concedes that the affidavit correctly noted that the issuance of grand jury subpoenas would have the effect of jeopardizing the investigation: "Of course no one was going to halt the investigation . . . to take the defendant before a Grand Jury to ask him who the second person was." Motion at 10. But the defendant then goes on to complain that the affiant should have said in the affidavit that the use of

grand jury subpoenas were unnecessary, in part[4] because there was a pre-arranged arrest time at which the government would be able to effectuate the arrest of a second conspirator. *Id.* Again, the government had made plain in the affidavit that this was the plan, Affidavit ¶ 32 & n.21, so there was no omission of relevant information from the issuing judge; the judge was able to assess the agent's opinion of the need for interceptions in light of the proposed plan.



The defendant also includes a preliminary background section to his motion ▮ ▮ Mandell discussed (i) the theoretical commission

---

[4]    The defendant also argues that the affidavit was false because the government had enough information to identify a second conspirator.  We address that specific contention in further detail below.

of criminal offenses contained in the indictment; (ii) "exactly when, where, and how the alleged victim would be abducted," (iii) "details of where the alleged victim would be taken and what procedures would be followed to divert law enforcement's investigation," (iv) "what would happen to the alleged victim after he was abducted," (v) "what each person's role would be during the course of the alleged offense." Motion at 6. The defendant studiously fails to mention in his motion that *all* this information was set forth in the affidavit for the issuing judge to consider. *See* Affidavit ¶¶ 17, 20, 23-25.[5]

In short, much of the defendant's argument concerning purported "misstatements" in the affidavit boils down to a disagreement with the affiant's ultimate conclusion that use of a bug was necessary in light of the progress of the investigation up to that point in time. For the reasons given earlier, the defendant's argument in this regard is simply wrong. The affiant correctly determined that a bug was necessary to gather satisfactory evidence to prove the guilt of Mandell's accomplice beyond a reasonable doubt; in light of all the relevant facts discussed above, the affiant's opinion that a bug was necessary does not come close to the type of "egregious error" that a defendant must demonstrate in order to obtain a *Franks* hearing. *Maro*, 272 F.3d at 822.

---

[5]

The only specific purported misstatements that defendant Mandell points to relate to the affiant's purported knowledge, at the time the affidavit was submitted, that Gary Engel was in fact Mandell's co-conspirator. The defendant points to several pieces of evidence to support his contention that the government knew, or should have known, that Engel was Mandell's unidentified accomplice. First, the defendant notes that the government did not note in the affidavit that Mandell used a telephone to contact Gary Engel 200 times between July 10, 2012 and October 10, 2012. Motion at 12. The defendant seemingly contends the omission of this information, if known to the agent, constituted a "material omission" because these phone calls would have served to "solidify the relationship between the defendant and Engel." *Id.* In the alternative, the defendant argues that if the affiant did not review these records and discover this connection, then the failure to do so demonstrates "agents did not employ a traditional technique that they themselves acknowledge would have led to the connection between Mandell and Engel." *Id.*[6]

This argument is a make-weight. The affiant explicitly noted that while toll records were helpful, they could not provide information concerning the "nature or substance of the conversations, and cannot differentiate between legitimate calls and calls of a criminal nature." Affidavit ¶ 56. As such, call records were ineffective in providing evidence concerning the totality of the conspiracy. The defendant does not

---

[6]     The government notes that the defendant does not even know whether the affiant saw these toll records before the application was submitted on October 18, 2012. Motion at 12 (noting defense does not know whether agents reviewed toll records prior to October 18, 2012). The defendant therefore is not entitled to a hearing because he has not come close to making the necessary "substantial preliminary showing" that any omission was made intentionally or with reckless disregard for the truth. *Franks*, 438 U.S. at 155-56.

point to anything from the toll records that reflect that the calls between Mandell and Engel were criminal in nature. Nor does the defendant point to any facts that reflect that the calls concerned the particular crime for which interception authority was sought. After all, as is clear from the affidavit itself, the defendant was engaged in multiple criminal endeavors at the same time. For example, the affidavit discussed at length Mandell's willingness to engage in a distinct crime -- the double-murder of Victim 2 and his wife. *Id.* ¶ 33-44. Indeed, as the defendant notes in his motion, a tracking device service used to monitor the movements of Victim 2's wife in advance of the double-murder plot was activated by using an email address containing Gary Engel's name. Motion at 13. But the government did not seek authority to conduct interceptions concerning Mandell's plans to engage in the murder-for-hire of Victim 2 and his wife – the authorization related to a different criminal plot -- the extortion/murder of Victim 1. So the fact that an account opened in Engel's name was used to monitor a tracking device used to follow Victim 2's wife did not establish Engel was a participant in a different crime.





In light of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the fact that Mandell may have been planning other crimes with Engel that were not the subject of the interception application could hardly be seen as dispositive as of October 18, 2012. In the same vein, Mandell also points to the fact that he and Engel had previously been prosecuted for kidnapping, which when taken with their telephone contact, should have been enough for the government to conclude that Engel was Mandell's accomplice.

---

Motion at 13-14.[10]



As noted earlier, the Seventh Circuit has held that the government is not required to demonstrate that it would be impossible to bring charges absent the use of a bug. Rather, the government may show necessity where the evidence is needed to satisfy its heavy burden of proving guilt beyond a reasonable doubt at trial and prove the depth and specific role of a co-conspirator in the charged offense. *Campos*, 541 F.3d at 748. The motion to suppress should be denied.

---

[10]     It appears the defendant maintains this evidence of prior bad acts is admissible in the government's case in chief at his trial; why else mention this evidence to show the bug was unnecessary unless the government can use this evidence to prove the subject offenses at trial? If the defendant does not believe this evidence of prior bad acts to be admissible, then he cannot use it to demonstrate the government had sufficient evidence and the bug was unnecessary.

## II.   The Defendant's Amended Motion for Severance of Counts [Docket #89] Should Be Denied.

### A.   Background

While Mandell and Engel were within the Target Location, preparing it for the restraint, torture and murder of Victim 1, Mandell told Engel that he wanted to leave the Target Location because he had a bunch of other things to do, including leaving a car "down south." This is understood to be a reference to leaving a car near Victim 1's house so that Mandell could use the vehicle to drive back from Victim 1's house after he looted it. *See* Complaint ¶ 23 (detailing Mandell's plan to drive Victim 1's vehicle back to Victim 1's house after Victim 1 was abducted to make it appear Victim 1 had returned home before disappearing). After his arrest, and after getting phone privileges at the Metropolitan Correctional Center, Mandell place a series of calls to his wife. Mandell instructed his wife to pick up a Nissan Maxima that Mandell had parked in a lot located across the street from the area where Victim 1 lived. Mandell told his wife that she needed to pick up the car but told her he wouldn't give her the instructions until the "very last minute" before the car was to be picked up. His wife suggested she shouldn't pick it up because it might be evidence but he convinced her otherwise. Moreover, he told her to enlist the aid of ███████████ in moving the vehicle, and Mandell further told her not to personally drive the vehicle because "maybe they'll say you're aiding and abetting a crime or something." Further, Mandell told his wife to ██████ clean out all that junk and throw all that shit out, okay?" Mandell also instructed his wife on another occasion to "throw away a lot of stuff" from the vehicle. The substantially empty vehicle was later found by law enforcement in the garage at Mandell's residence.

25

### B. Applicable Law

Federal Rule of Criminal Procedure 8(a) allows the joinder of offenses that "are of the same or similar character." *See generally United States v. Handlin*, 366 F.3d 584, 591 (7th Cir. 2004). Judicial efficiency motivates a strong policy preference in favor of joinder. *See United States v. Nettles*, 476 F.3d 508, 516 (7th Cir. 2007) ("We have broadly construed Rule 8(a) to allow liberal joinder in order to enhance judicial efficiency."). *Accord United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000). Accordingly, the Seventh Circuit has held that the "same or similar character" requirement of Rule 8(a) "is a rather clear directive to compare the offenses charged for categorical, not evidentiary, similarities." *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994).

### C. Analysis

Joinder of the obstruction of justice count (Count Six) is appropriate because it is factually and legally intertwined with the other criminal conduct charged in the indictment. The defendant's charged obstructive conduct was designed to prevent the government from acquiring evidence – specifically, evidence within a "getaway" vehicle that was utilized in connection with the kidnapping and extortion of Victim 1. Moreover, the evidence of defendant's involvement in the plan to kidnap and extort Victim 1 will establish the defendant's motive for attempting to obstruct justice, and evidence of defendant's efforts to obstruct justice in turn tends to establish defendant's guilty consciousness concerning his involvement in the planned kidnapping and extortion of Victim 1.

26

The factual situation here is similar to that in *United States v. Berardi*, 675 F.2d 894 (7th Cir. 1982). The defendant in *Berardi* was charged in a seven-count indictment with mail fraud, extortion; the defendant was additionally charged with obstructing justice by attempting to change the testimony of one of the witnesses to the mail fraud. 675 F.2d at 895-96. The Seventh Circuit held that the counts were properly joined because the evidence of defendant's involvement in extortion and mail fraud tended to establish a motive for the obstruction of justice, and evidence of defendant's efforts to influence a co-conspirator's testimony tended to establish defendant's guilty consciousness of the illegal payoffs. *Id.* at 900 (citing *United States v. Rajewski*, 526 F.2d 149 (7th Cir. 1975) ("On the one hand, the accumulated evidence of fraud tended to establish the motive for [defendant's] obstruction of justice, and, on the other hand, the accumulated evidence of the grand jury proceedings and the events leading up thereto tended to establish [defendant's] guilty consciousness of the fraud. The two facets of the evidence were mutually dependent upon and inextricably connected with one another, in spite of the fact that the evidence proving them individually was not identical.")).

Similarly, in *United States v. Little Dog*, 398 F.3d 1032 (8th Cir. 2005), the Eighth Circuit held that joinder of an obstruction of justice charge with sexual abuse and sexual contact charges was proper because the obstruction charge was based on an alleged attempt to persuade witnesses to give false testimony in trial on sexual abuse charges. The *Little Dog* court therefore held that the obstruction charge was connected to, and interrelated with, the sexual abuse charges; if the charges had been severed, evidence of defendant's attempt to tamper with and influence witnesses would have

been admissible at his sexual abuse trial to show criminal intent and state of mind, and evidence of defendant's sexual abuse would have been admissible at obstruction trial to show his motive. *Id.* at 1037. *See also United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002) (witness tampering and felon-in-possession charges properly joined "because they were factually interrelated").

In *United States v. Peoples*, 748 F.2d 934 (4th Cir. 1984) (*per curiam*), moreover, the court found that charges of bank robbery and subsequent escape were sufficiently connected to permit joinder. The defendant in *Peoples* robbed a bank in Florence, South Carolina, on March 26, 1982. *Id.* at 935. Police officers captured the defendant after a car chase and gun battle. *Id.* On April 4, 1982, the defendant escaped from a detention center in Florence, but was recaptured. *Id.* According to the court, "[defendant] escaped only days after the robbery, the robbery led directly to custody, and although [defendant] had other outstanding charges against him, the robbery charge was the most recent motive for flight." *Id.* at 936. *See also United States v. Gabay*, 923 F.2d 1536 1539-40 (11th Cir. 1991) (joinder of counterfeiting and bond jumping charges was proper, considering that his motive for flight was "directly related to his impending prosecution for counterfeiting").

More recently, in *United States v. Calabrese*, No. 02 CR 1050 (N.D. Ill.) (Zagel, J.), the district court denied a similar request to sever an obstruction of justice count from racketeering conspiracy charges. In doing so, the district court pointed to much of the caselaw and reasoning set forth above. *United States v. Calabrese*, No. 02 CR 1050 (N.D. Ill. May 11, 2007) [Docket # 512 at 25-26].

The defendant argues that the obstruction of justice charge should be severed from the remainder of the charges. He argues that severance is proper because the conversations with his wife occurred after the end of the alleged conspiracies charged. But, as discussed above, this is of no consequence. The obstructive conduct was designed to cover up the defendant's participation in the other crimes charged in the indictment, so it is sufficiently related to the other counts to permit joinder. Indeed, it would make little sense to sever Count Six because the obstructive conduct would be unintelligible unless the jury understood what other crimes the defendant had planned to commit, that he had been foiled by law enforcement, what relevance the vehicle had in relation to those other crimes, and that the defendant was trying to destroy evidence of those other crimes.

The defendant is also wrong in suggesting that severance should be granted because he will suffer prejudice from joinder. As the Seventh Circuit made clear in *Berardi*, the government is entitled to affirmatively rely on the defendant's obstructive conduct as consciousness of guilt evidence with respect to the other charges in the indictment. Accordingly, the evidence with respect to Count Six helps in proving him guilty of other conduct charged in the indictment, and would be admissible even if the government had not charged the defendant with obstruction of justice. In any event, "it is insufficient that separate trials" would offer "a defendant a better opportunity for an acquittal." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v.*

*Souffront*, 338 F.3d 809, 828 (7th Cir. 2003) (quoting *United States v. Zafiro*, 506 U.S. 534, 538-39 (1993)).

Moreover, in considering whether substantial and injurious effect or influence is present in a case, the Seventh Circuit considers the effect of an appropriate limiting instruction. *United States v. Pigee*, 197 F.3d 879, 891 (7th Cir. 1999); *United States v. Simpson*, 479 F.3d 492, 500 (7th Cir. 2007). The government submits that an instruction to the jury that informs them of the proper use of the evidence consistent with the Seventh Circuit's decision in *Berardi* fully addresses any potential unfair prejudice. If the Court instructs the jury in this way there is "no reason to suppose that it would disregard this mandate." *United States v. Stokes*, 211 F.3d 1039, 1043 (7th Cir. 2000*)* (citation and quotation marks omitted). "The Court presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instruction given them." *United States v. Linwood*, 142 F.3d 418, 426 (7th Cir. 1998). S*ee also United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995). After all, "proper jury instructions are an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Quilling*, 261 F.3d 707, 715 (7th Cir. 2001) (internal quotation marks and citations omitted). *See also United States v. Turner*, 134 Fed.Appx. 17 (6th Cir. May 26, 2005) (unpublished) (defendant argued that failure-to-appear charge should have been severed and tried separately; court rejected defendant's Rule 14 argument, holding that "as always the jury was instructed to consider each charge separately based on the evidence applicable to that charge. So [defendant's] generalized claim of prejudice does not support a

finding that the district court abused its discretion, nor does it establish an extraordinary reason to reverse) (citing *United States v. Ritch*, 583 F.2d 1179, 1181 (1st Cir.1978) (collecting cases)).  For these reasons, the motion should be denied.























**The Defendant's Motion for Immediate Disclosure of Favorable Evidence [Docket #91] Should Be Granted in Part and Denied in Part.**

Mandell requests that the government produce information that is favorable to him or that bears on the credibility of a government witness. Motion at 1 (citing *Kyles v. Whitley*, 514 U.S. 419 (1195); *United States v. Bagley*, 473 U.S. 667 (1986); *Giglio v. United States*, 405 U.S. 150 (1972); and *Brady v. Maryland*, 373 U.S. 83 (1963)). The government is aware of its obligations under these cases and has and will continue to produce any material which falls into the requested categories. The government considers its obligation to produce such material to be ongoing. The government will produce such material should it become available. The government does not intend to withhold production of *Brady* material until a particular time before trial. The government's specific responses to Mandell's requests are set forth below.

Mandell requests that the FBI and the Cook County State's Attorney's Office produce to him copies of his own informant files. The defendant has failed to articulate any legitimate reason in his motion why the contents of these files are relevant in this case, and therefore this request should be denied.

Alternatively, the government will, upon the Court's request, produce to the Court the FBI's informant file for *in camera* review. The government objects to production of the entire FBI Mandell informant file to Mandell or his defense counsel and to the production of any of its contents without prior *in camera* review.

The government has not reviewed and has not secured access to any informant file in the possession of the Cook County State's Attorney's Office, and the defendant has similarly failed to explain why any such file would be relevant in any case. This request should also be denied.





The government will produce any reports of interview of any individual who has provided information that is: (a) favorable to Mandell; (b) tends to exculpate Mandell; (c) consistent with Mandell's claim of innocence; (d) contradicts anticipated testimony of a government witness; (e) reflects adversely on a government witness's credibility. The government objects to producing to Mandell the address of any individual or witness subject to any such report and to the producing any handwritten agent notes which served as the basis of any such report.

Mandell requests the production of information and evidence about any government witness or any individual known to the government who has also engaged in any of the conduct that is the subject of the charges against Mandell in the indictment. Gary Engel was Mandell's co-conspirator and partner for the crimes charged in Counts One, Two and Three of the Superseding Indictment. Mandell's wife assisted Mandell with the crime charged in Count Six. Gary Engel also assisted Mandell with the crimes charged in Counts Seven and Eight.

[REDACTED] eek, in various permutations, statements and evidence that can be utilized to exculpate the defendant or impeach government witnesses. The government has already produced such information to the defendant in the course of discovery and will continue to produce any such information consistent with its legal obligations under *Brady*, *Giglio* and the Jencks Act. The government will produce any additional information that can be used to impeach its witnesses on the same date it has been ordered to produce 3500 material in this case.

To the extent the defendant seeks to impose any greater burden upon the government through his requests, the government objects. For example, the defendant on several occasions (e.g., paragraph 8, 9) asks the government to produce the last known address of any individual with testimony consistent with the defendant's innocence. Although the government is not aware of any such individual, given the defendant's proclivity for violence, the government notes its objection to providing the defendant with the residential information of any witness in this case. As another example, the defendant in paragraph 18 asks for information concerning any criminal activity in which a government witness has engaged that has not resulted in prosecution or conviction. While the government will be able to provide arrest histories for its witnesses, the government does not intend to conduct any independent investigation of prior arrests that did not result in conviction to assess what if any "criminal activity" surrounded such arrests. Third, the defendant asks for information

in the government's possession its possession about any illegal or unauthorized conduct by agents or persons acting on behalf of law enforcement in connection with the charges brought against the defendant. The government objects to Mandell's request to the extent that it gratuitously requests information about any improper conduct in any "related" investigation.

Finally, in paragraph 13, the defendant seeks documentation relating to handwriting exemplars. There is no such documentation in the government's possession.

WHEREFORE, the government respectfully requests that the Court enter orders (i) ruling on the defendant's motions in the manner set forth herein; and (ii) granting the government such other and further relief as may be just and proper.

Dated:      Chicago, Illinois
             October 7, 2013

Respectfully submitted.

MANISH S. SHAH
Attorney for the United States

By:    /s/ Amarjeet S. Bhachu
       AMARJEET S. BHACHU
       DIANE MacARTHUR
       Assistant United States Attorneys
       219 South Dearborn Street
       Fifth Floor
       Chicago, Illinois 60604
       (312) 469-6212

## CERTIFICATE OF SERVICE

Amarjeet S. Bhachu, an Assistant United States Attorney assigned to the instant matter, hereby certifies that the attached GOVERNMENT's AMENDED CONSOLIDATED RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS was served on October 7, 2013, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Amarjeet S. Bhachu
AMARJEET S. BHACHU
Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604