IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) |  |
| --- | --- | --- |
|  | ) |  |
|  | ) | Case No. 12 CR 842 |
| v. | ) |  |
|  | ) |  |
| STEVEN MANDELL | ) |  |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Steven Mandell has moved to suppress from introduction at trial all wiretap evidence obtained pursuant to two wiretap orders entered on October 18, 2012. Defendant argues that the government unlawfully intercepted the communications because the wiretap applications fail to meet the necessity requirements set forth in 18 U.S.C. §§ 2518(1)(c) and 3(c). In addition, Defendant seeks a *Franks* hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). For the reasons discussed below, Defendant's motion is denied.

## BACKGROUND

On November 1, 2012, a grand jury returned an Indictment against Steven Mandell and his co-defendant, Gary Engel, charging two counts of extortion under 18 U.S.C. § 1951(a). (R. 13.) The Court subsequently granted the government's motion to dismiss co-defendant Gary Engel from the indictment after he was found dead in his prison cell. (R. 24.)

1

## I. The Charges in the Superseding Indictment

On March 21, 2013, a grand jury returned an eight-count Superseding Indictment against Defendant. (R. 38, Sup. Ind.) The Superseding Indictment charges Mr. Mandell with conspiracy to commit kidnapping in violation of 18 U.S.C. § 1202, (Count I); conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951(Counts Two and Three); possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Four); felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Five); obstruction of justice, in violation of 18 U.S.C. § 1512 (Count Six); and murder-for-hire, in violation of 18 U.S.C. § 1958(a) (Counts Seven and Eight). The Superseding Indictment also contains a forfeiture allegation.

Count One charges Mr. Mandell with a conspiracy to extort Victim One. It alleges an elaborate scheme in which Defendant and co-conspirator Engel agreed to pose as police officers and arrest Victim One, take him to a designated location, torture and extort him, murder Victim One, and then chop Victim One's body into pieces. It specifically alleges that Defendant intended to use threats of force to get Victim One to disclose where he kept bulk cash in his residence so Mandell could steal it, and to execute legal documents that would transfer the ownership of certain real estate from Victim One to Defendant Mandell. Defendant and Engel then allegedly planned to kill Victim One, drain Victim One's body of blood, and dismember him. The Superseding Indictment further alleges that they "obtained, maintained and used various tools and instrumentalities in order to assist in carrying out the kidnapping, restraint, extortion, torture and murder of Victim 1, including but not limited to: handcuffs, false law enforcement identification documents and badges, a forged arrest warrant, police scanners,

2

walkie-talkies, cellular telephones, a ski mask, a wheelchair, zip-ties, anchors, a firearm, goggles, saws, a butcher block, knives, and a hemostat." (R. 38 at ¶ 8.) Counts Two and Three charge Defendant with extortion and attempted extortion in connection with this conduct targeting Victim One on October 25, 2012.

Count Four charges Defendant Mandell with knowingly possessing a firearm in furtherance of a crime of violence. Count Five charges Defendant with being a felon in possession of a firearm, namely, a Ruger .22 caliber pistol.

Count Six charges Defendant Mandell with obstruction of justice, stemming from his alleged use of the telephone and mail privileges after his initial court appearance on October 26, 2012. (*Id.* at 5.) Counts Seven and Eight charge Defendant Mandell with murder-for-hire. These counts "concern Mandell's participation in the planned murder of a second victim" so that Mr. Mandell could take control of the revenues from an adult entertainment club. (*Id.* at 18.)

## II. The Wiretaps

In connection with its investigation in this case, the government submitted two applications to then-Chief Judge James Holderman for authorization to intercept oral communications and visual, non-verbal conduct at 5308 West Devon Avenue, Chicago, Illinois (the "Target Location"). One application was for the interception of oral communications at the Target Local and one was for the interception of visual, non-verbal actions taken at the Target Location. Both of the applications pertained to the charges involving Victim One. They did not seek to intercept communications pertaining to the charged crimes in Counts Seven and Eight involving Victim Two. Special Agent Richard Tipton of the Federal Bureau of Investigation ("FBI") was the affiant on both affidavits submitted in support of the applications.

3

On October 18, 2012, then Chief Judge Holderman entered orders that authorized the interception of oral communications and visual, non-verbal conduct at the Target Location. In both Orders, Chief Judge Holderman found that the government had met the legal requirements for a Title III wiretap, including establishing that normal investigative procedures either had been tried and were not fully successful, reasonably appeared unlikely to succeed if they were tried, or were too risky to employ under the circumstances. The FBI thereafter installed the appropriate monitoring devices. Afterwards, the FBI intercepted Defendant Mandell and Gary Engel meeting at the Target Location. According to the affidavit, law enforcement did not know Engel's identify prior to the interceptions. On October 23, 24 and 25, the FBI intercepted both Mandell and Engel at the Target Location where they discussed "the torture, murder and dismemberment of Victim 1." (R. 100, Consolidated Response at 3.) As part of these discussions, they discussed the following:

- Where and how they would restrain Victim One at the Target Location, including that they wanted him sitting down; (R. 1, Complaint ¶¶ 21-22)

- The fact that they would place a ski mask over Victim One's face so he would be in the dark when he initially came to the Target Location; (*Id.* at ¶ 24(a))

- The dismemberment of Victim One's body after they killed him, including where to drain the blood; (*Id.* at ¶ 24(b))

- The cover story they intended to use to get Victim One to the Target Location, namely, they planned to pose as police officers who had a signed arrest warrant for Victim One; and (*Id.* at 24(f), 24(g))

- How the two would respond if law enforcement officers stopped them during their endeavors. (*Id.* at ¶ 24(h).)

Defendant seeks to suppress the evidence obtained from these Title III wiretaps on the grounds that the government has failed to establish necessity for the wiretap. In addition,

Defendant contends that due to the lack of necessity for the wiretap, Agent Tipton knowingly omitted various facts from the affidavits in support of the wiretaps in order to disguise the fact that he knew Gary Engel was Defendant's accomplice. In essence, at the heart of Defendant's requests is his assertion that the FBI knew that Engel was Defendant's accomplice in the alleged charges when Agent Tipton submitted the affidavits to then-Chief Judge Holderman, yet Agent Tipton withheld this information in order to claim that the government needed the wiretaps to determine the identity of Mandell's accomplice in the alleged crimes.

## ANALYSIS

### I. The Government Established Necessity for the Wiretaps

In order to obtain a wiretap pursuant to a Title III, the government must satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c). In order to comply with the necessity requirement, the government's application must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. 2518(1)(c). As the Seventh Circuit has explained, the necessity requirement "was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are 'not to be routinely employed as the initial step' in a criminal investigation." *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006), quoting *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991). *See also United States v. Long*, 639 F.3d 293, 301 (7th Cir. 2011). "Hence, the government's burden of establishing necessity is not high." *Long*, 639 F.3d at 301, citing *United States v. Campos,* 541 F.3d 735, 746 (7th Cir. 2008). *See also United States v. Hunter*, 2011 WL 4345683 (N.D. Ill. Sept. 15, 2011).

Furthermore, "the requirement of exhausting other investigative procedures prior to obtaining a wiretap is reviewed in a practical and common-sense fashion." *McLee*, 436 F.3d at 763. See also *Long*, 639 F.3d at 301, citing *Campos*, 541 F.3d at 746. (citations and quotations omitted). "It does not require that any other investigative procedure be tried first before an order is issued for the interception of wire communications." *Campos*, 541 F.3d at 746. The necessity requirement also does not require the government to establish that it could not prosecute a defendant without the wiretap "or that evidence possibly sufficient for indictment could not conceivably be obtained through other means." *McLee*, 436 F.3d at 763. *See also United States v. Fudge*, 325 F.3d 910, 918-19 (7th Cir 2003) ("Wiretaps do not have to be used only as a last resort in an investigation").

Defendant Mandell argues that the government had more than sufficient evidence to indict him prior to applying for and obtaining the wiretap. He asserts that the government's investigation had succeeded through the use of normal investigative techniques thus the government cannot prove necessity. Specifically, Defendant Mandell contends that prior to the submission of Special Agent Tipton's affidavits,

**REDACTED**

recorded numerous conversations with Mandell. According to Defendant, as of the date the government filed its motion and supporting affidavits for the wiretap applications, "law enforcement already knew who the victim was to be, where he would be abducted, when he would be abducted … how he would be abducted, what would happen after he was abducted, where he would be taken." (R. 93, Motion at 6.) Defendant further argues that the government

6

could have determined the identity of Defendant's associate in the charged conduct through normal investigative techniques.

### A. Agent Tipton's Affidavits[1] Detailed the Factual Predicate for the Necessity Requirement

The Affidavit submitted in support of both wiretaps establishes necessity. Agent Tipton specifically detailed how law enforcement had used other investigative procedures during the course of the investigation and why such procedures either failed, reasonably appeared unlikely to succeed or were too dangerous to carry out. His affidavit specifies the investigative techniques the FBI had used at the time, including the use of **REDACTED** consensually monitored conversations, reviews of numerous financial, telephone and arrest records, physical surveillances, pen registers, and trap and traces. Contrary to Defendant's contention, Special Agent Tipton did not just assert conclusions. He provided specific details why the wiretap was necessary to identify Defendant's conspirators, and in particular, his associate in the conduct targeting Victim One. The affidavit, for example, disclosed that law enforcement had used physical surveillance in the investigation, but "most of the planning concerning the extortion of [Victim One] to date has not taken place in public places, and a critical portion of the illegal activity under investigation here is expected to take place within the Target Location. The interior of this location cannot be subjected to effective surveillance from the outside. Indeed, the back room area of the Target Location will be enclosed by newly constructed drywall, thus preventing effective surveillance of activities occurring within this area." (Tipton Affidavit, dated October 18, 2012 ("Tipton Aff."), at ¶ 47.) Agent Tipton further explained that surveillance is "likely to be very risky" because Defendant Mandell is a former

---

[1] Because the affidavits are based on the same factual predicates, the Court will refer to them as Agent Tipton's affidavit rather than affidavits.

police officer who likely has familiarity with surveillance techniques. (*Id.* at ¶ 48.) In addition, Agent Tipton explained that during the course of law enforcement's investigation in this case, Defendant has been particularly cautious. He uses "code words, hushed tones, hand gestures and facial expressions to communicate" **REDACTED**. (*Id.* at ¶ 49.) Defendant also expressed concern that his own surveillance of others would be detected. (*Id.*) An FBI agent also observed Defendant looking at surveillance cameras in Sams Club in Wheeling just nine days before the government submitted the wiretap application. (*Id.* at ¶ 50.) Given his activities, Agent Tipton noted "the additional risk exists that MANDELL will install surveillance cameras in the vicinity of the Target Location, thus making surveillance more difficult because MANDELL will be able to perform counter-surveillance." (*Id.*) Similarly, law enforcement considered the installation of a pole camera near the Target Location but had concerns that Mandell would detect it given his prior law enforcement experience and caution. Such a pole camera would also fail to disclose the activities inside the Target Location.

The supporting affidavit also explained the impracticality of issuing grand jury subpoenas. Specifically, such subpoenas would alert the targets to the investigation, likely result in the invocation of Fifth Amendment privileges not to testify, and fail to identify other conspirators. (*Id.* at ¶ 53.) *See Campos*, 541 F.3d at 747.

Regarding **REDACTED** undercover agents, the affidavit details

**REDACTED**

Mandell "has deliberately withheld **REDACTED** the identity of the individual who will assist him in the extortion of [Victim One] at the Target Location." (*Id.* at ¶ 54.) **REDACTED**

**REDACTED**

8

**REDACTED**

Given Mandell's position, Agent Tipton opined, based on his experience, **REDACTED** "is not in a position to identify all members of this ongoing criminal conspiracy, develop admissible evidence concerning the respective roles of each conspirator, or furnish particular details about the relative responsibilities that will be assigned to MANDELL and his co-conspirator in connection with the extortion of [Victim One]." (*Id.* at ¶ 54.)

Furthermore, law enforcement did not use an undercover agent in the investigation because such an agent "would likely be unable to gain the trust and confidence of MANDELL." (*Id.* at ¶ 55.) Given Mandell's former position as a police officer, he "is also likely to be more suspicious of any effort to introduce an unknown individual to him." (*Id.*) *See Campos*, 541 F.3d at 747.

Agent Tipton also explained that pen registers would be of limited value to law enforcement because such an investigative tool did not disclose the nature or substance of conversations, and thus would not disclose the totality of the conspiracy, including co-conspirators, under investigation. (*Id.* at ¶¶ 56-57.) Indeed, the government obtained approval and utilized a digital analyzer device as to Defendant and was "attempting to identify other telephones used by MANDELL from the information provided by the digital analyzer device." (*Id.* at 57.) Agent Tipton explained, however, that although the use of the digital analyzer device would assist in demonstrating with whom Mandell had frequent contact, it would not reveal the nature and substance of the conversations or whether such conversations pertained to legitimate or criminal matters. (*Id.*)

9

Agent Tipton also explained that he considered the use of interviews, but ultimately ruled them out based on his experience and that of other agents. Because they did not know the identity of Defendant's co-conspirator, they could not interview him. Moreover, law enforcement did not anticipate any success from interviews because Defendant, in a recorded conversation **REDACTED** had discussed

**REDACTED** how to deceive law enforcement if questioned. (*Id.* at 58.) Specifically, in a recorded conversation that took place between Mandell **REDACTED** on September 30, 2012, Mandell discussed responding to law enforcements questions regarding the murder of Victim 2:

> "How can I help you with this bullshit? Wow he was – this is a murder investing--? This is critical. These are legal matters, I don't involve myself in legal matters, I have lawyers to attend to this. They'll gladly … handle all your questions. Now leave.' F. Lee Bailey wouldn't let you answer a question would he?"

(*Id.* at note 31.) Mandell even role played **REDACTED** how to respond to questions by law enforcement regarding Victim Two. (*Id.* at note 31.)

**REDACTED**

Mandell then suggested a possible response to law enforcement: "Italian guy, Franklin Park cop, who runs five joints. That smells like organized crime. I think you're in the wrong neighborhood.' I mean, you just – it's endless dialogue that goes like this. Go beat on someone else's door. Try him." (*Id.*)

In addition, Special Agent Tipton explained why the use of search warrants would likely prove unsuccessful. According to Agent Tipton, the use of a search warrant at the Target

Location would only alert the targets of the investigation and fail to disclose the identity of Mandell's co-conspirator. (*Id.* at 59.) Agent Tipton further explained that Mandell still had the Target Location under renovation thus a search would not likely result in any evidence. (*Id.*)

Finally, the affidavit explained that law enforcement had not conducted any trash pulls in the investigation because they did not anticipate finding any "material evidence" from trash pulls. Law enforcement had concerns that conducting a trash pull at the Target Location would likely alert Defendant and his co-conspirator and therefore compromise the investigation. (*Id.*) In addition, Defendant lived in a multi-unit condominium thus identifying his trash would prove challenging. (*Id.*) Furthermore, "given the level of caution MANDELL has displayed thus far, it is highly unlikely that MANDELL will have deposited evidence sufficient to prove the commission of the Subject Offenses and the identity of his co-conspirator in his trash." (*Id.*)

In sum, Special Agent Tipton's affidavit establishes that the FBI tried and/or considered normal investigative procedures, but they either failed or reasonably appeared unlikely to succeed. As detailed above, some of the procedures also appeared too dangerous to implement. Agent Tipton described these procedures in detail and particularized the facts to this investigation. He clearly informed Chief Judge Holderman that the wiretap was necessary to identify Defendant's co-conspirator and his role in, and knowledge of, the offense. In addition, Agent Tipton explained in detail how Defendant Mandell's caution and suspicious given his prior training as a police officer and his specific cautious behavior in this case rendered the use of some of these techniques either unlikely to succeed or too dangerous to carry out.

Defendant's argument that the FBI knew the history between Mandell and Engel also fails to defeat the necessity requirement. Even if the FBI knew the two had a history, the

government had little evidence to establish Engel's knowledge of the planned abduction and murder of Victim One. The wiretaps provided critical evidence to establish Engel's knowledge and participation in the conspiracy. *See Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995) ("Even if it were true that the government could have prosecuted [defendant] without the tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict these five [additional defendants], the key players in the drug ring. It would have been far more difficult or impossible to determine the extent of their involvement… by merely observing transactions from a distance.").

In addition, Defendant contends that surveillance at the Target Location would have disclosed the identity of Gary Engel when Engel met Defendant there. Engel's mere presence at the scene, however, would not have provided direct evidence concerning his knowledge and participation in the charged conspiracy. *See United States v. Vargas*, 689 F.3d 867, 878 ("a defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt").

### B. Necessity Is Met Where Government Established Need to Identify Other Members of the Conspiracy

Defendant claims that at the time the government submitted its application for the wiretap, its investigation was so advanced **REDACTED** that it cannot establish necessity. It is well settled in the Seventh Circuit, however, that necessity for a wiretap is demonstrated where investigators are "having trouble fingering other members of the conspiracy." *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991). As the Seventh Circuit has noted "the fact that an arrest could have occurred earlier does not preclude a finding of necessity where, as here, the basis for necessity was a demonstrated need to root out additional

co-conspirators." *United States v. Long*, 639 F.3d 293, 301 (7th Cir. 2011). *McLee,* 436 F.3d at 763 ("The government's demonstrated need for a wiretap as a means of identifying all coconspirators and the roles they occupied in the structure of the conspiracy is sufficient for a finding of 'necessity' under the statute"); *Fudge,* 325 F.3d at 919 (rejecting argument that "evidence of a specific individual engaging in a criminal activity obviates the need for" a wiretap, since "the government used the wiretap for a number of reasons, not the least of which was to obtain more incriminating evidence. We do not find such a basis problematic."). As Agent Tipton disclosed in his supporting affidavit, the necessity for the wiretap was premised on the need to identify Defendant's conspirator and establish his guilt in the crime:

> I believe that the interception of oral communications, as well as visual, non-verbal conduct, us the only available technique with a reasonable likelihood of securing the evidence necessary to ascertain the identity of, and prove beyond a reasonable doubt the guilt of, the participants and co-conspirators engaged in the Subject Offense described herein. Such persons include the individual that MANDELL has identified as his "associate" who will take custody of [Victim One] at the Target Location after [Victim One] is abducted, and who will dispose of [Victim One's] dead body. Although normal investigative procedures have been successful in initiating this investigation, these investigative procedures have been tried and failed, or reasonably appear to be unlikely to succeed if continued further or tried, or are too dangerous to employ in achieving all the objectives of the investigation.

(Affidavit at ¶ 45.) The affidavits make clear that the agents extensively and arduously investigated this case, but needed the wiretaps to identify and establish evidence against Defendant's accomplice in the charged scheme targeting Victim One. The affidavit properly disclosed that the necessity for the wiretap was to identify Defendant's accomplice in the charged crimes. Viewing the government's requirement to exhaust normal investigative procedures in a "practical and common-sense fashion," the government has met its burden of

establishing necessity in the affidavits supporting the wiretaps. Accordingly, the Court denies Defendant's motion to suppress.

## II. *Franks* Hearing

Defendant next argues that the agent's affidavit contained material omissions that require a *Franks* hearing. Specifically, Defendant contends that the affidavit failed to include facts regarding Engel which the judge needed to know in order to make an informed decision. The Court disagrees.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that intentionally or recklessly submitting false statements in an affidavit submitted in support of a search warrant violates the Fourth Amendment. The affidavit, however, has a "presumption of validity." *Id.* at 171. In order to obtain a *Franks* hearing, Defendant must establish that the affiant knowingly, intentionally, or with reckless disregard for the truth made a false statement in the affidavit, and that the false statement is necessary to the finding of probable cause in the context of a search warrant. *Id. See also United States v. Robinson*, 724 F.3d 878, 886 (7th Cir. 2013). A hearing is also warranted if the affiant intentionally or recklessly *omitted* material information from the affidavit. *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008). The omitted facts "must be 'material' to the probable cause determination." *United States v. Norris*, 640 F.3d 295, 302 (7th Cir. 2011). *See also United States v. McDuffy*, 636 F.3d 361, 363 (7th Cir. 2011) ("an omitted detail is material only if its inclusion would upset a finding of probable cause"). As the Seventh Circuit has made clear, the "standard is not whether the affidavit contains a false statement, but whether the affiant knew or

should have known that a statement was false." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009), citing *United States v. Jones*, 208 F.3d 603 (7th Cir. 2000).

The Seventh Circuit has also held that defendants cannot meet the high standard of a *Franks* hearing by arguing that the police could have done more work on a case. *Johnson*, 580 F.3d at 671, citing *United States v. Swanson,* 210 F.3d 788, 791 (7th Cir. 2000). "Even if the police's failure to corroborate the informant's claims was negligent, 'a little negligence-actually even a lot of negligence-does not the need for a *Franks* hearing make.'" *Id*. Furthermore, "[i]t is relatively difficult for a defendant to make the 'substantial preliminary showing' required under *Franks*." *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013).

The majority of the case law in the area of a *Franks* hearing pertains to affidavits submitted in support of search warrants. In the context of the affidavit submitted in support of the wiretap in this case, in order to obtain a Franks hearing, Defendant Mandell must make a "substantial preliminary showing" that 1) the agent omitted a statement from the affidavit; 2) the statement was omitted for the specific purpose of misleading the issuing judge or with reckless disregard as to whether it would mislead the issuing judge; and 3) the omitted information was material to the judge's determination. *Franks*, 438 U.S. at 155-56.

Defendant asserts that Agent Tipton omitted material information from his affidavit that would have informed then Chief Judge Holderman that Gary Engel was Defendant's accomplice in the conduct targeting Victim One. He claims that Chief Judge Holderman "was deliberately denied information that he needed to know in order to make an informed determination…" (R. 109, Reply at 4.) Specifically, Defendant claims that the affidavit did not disclose Engel's involvement with Defendant in a different offense – the murder for hire of Victim Two, the

15

existence of over 200 telephone contacts between Defendant and Engel during the relevant time period, and Defendant's meeting with Engel on October 5, 2012, the same day Mandell had conducted surveillance on Victim Two. It also did not disclose, according to Defendant, their prior criminal history from over thirty years ago.

As an initial matter, Agent Tipton's affidavit made clear that the necessity requirement pertained to the identification of any of Mandell's co-conspirators, including the individual who Defendant Mandell identified as his "associate" who would take custody of Victim One at the Target Location after they abducted Victim One, and who would help to dispose of Victim One's body.

### A. Defendant has Failed to Make a Substantial Preliminary Showing that the Affidavit Contained Material Omissions

Defendant identifies two alleged "omissions" in the affidavit regarding the alleged crime against Victim Two. The affidavit, however, did not seek to intercept wire communications regarding the murder for hire of Victim Two. Thus, Defendant's argument that failure to include this information in the affidavit was a material omission regarding the affidavit supporting the interception of communications pertaining to the plot against Victim Two is a stretch.

Furthermore, the nature of the identified evidence does not support Engel's involvement in the case against Victim One. Defendant notes that Mandell **REDACTED** had placed a tracking device on a vehicle being used by the wife of Victim Two. Mandell **REDACTED** could track the wife's vehicle's movements on a specific website. On the same day, the agents contacted the account manager at the identified website and discovered that Gary Engel was the name on the original activation of the account. On the day that Victim Two's wife was being tracked, Gary Engel logged into the account eight times under the email

16

he allegedly used to activate the account. This evidence pertains to a separate offense that was not the subject of the wiretaps. As the government notes, Defendant's suggestion that because Engel committed one crime with Defendant he must be the "accomplice" in the crime against Victim One is an improper propensity argument under Federal Rule of Evidence 404(b).

Defendant also challenges the omission of phone records showing over 200 contacts between Engel and Mandell during the time period encompassing the alleged conspiracy. The affidavit did not reveal this number of calls. Defendant, however, has not established that Agent Tipton was aware of these calls when he submitted the affidavit. Defendant claims that it does not matter if the agent had the records at the time or not – "what is important is that whatever the answer is to that question, the affiant clearly created the unmistakable impression in the affidavit that he could not obtain a phone number that **REDACTED** would allow him to get those records. That unmistakable impression was false." (R. 109, Reply at 14.) Defendant must establish that the agent knowingly omitted the information or did so with reckless disregard. In order to do so, Defendant would have to show that he knew about the calls.[2] Moreover, as Agent Tipton represented in his affidavit, telephone contacts do not establish that the calls pertain to criminal activity, and do not reveal the content of the calls.

Defendant also challenges the omission of surveillance conducted on October 5, 2012. Specifically, law enforcement observed Defendant Mandell meet with Engel on October 5, 2012 – the same day agents had observed Mandell conduct surveillance of Victim Two using a Crown

---

[2] Indeed, the government has represented that it subpoenaed the relevant telephone toll records on or about October 12, 2012, and a response to the subpoena was sent by the telephone service provider to an administrative assistant at the FBI on the morning of October 18, 2012—the same day the affidavit was sworn out. Defendant has not asserted that the agent even had an opportunity to review the toll records before the affidavit he swore to the affidavit's content. Furthermore, the government has represented that the telephone toll records did not contain any subscriber information for this telephone number, but subsequent information revealed that Henry Engel was the subscriber. (R. 114, Sur-Reply at note 6.) The Court, however, is not considering this information in its analysis because Defendant has not met his threshold showing.

17

Victoria registered to **REDACTED**.  This contact pertains to Victim Two, the Victim of a different alleged crime that was not the subject of the wiretap application.  It does not meet a substantial showing that Engel had any involvement in the crime again Victim One charged in the Indictment.

Finally, Defendant notes that the FBI knew of the specific past criminal relationship between himself and Engel.  The affidavit did not disclose this relationship.  Although Mandell and Engel were charged with, and convicted of, participating in a kidnapping, reviewing courts subsequently vacated both of their convictions.  *See State ex rel. Engel v. Dormire*, 304 S.W.3d 120 (Mo. 2010) (vacating Engel's conviction); *Manning v. Bowersox*, 310 F.3d 571 (8th Cir. 2002) (vacating Mandell's conviction).  Given that courts vacated both convictions, Defendant cannot now fault the government for failing to disclose this information regarding their "specific past criminal relationship" that took place over thirty years ago.

Defendant has failed to make a substantial preliminary showing that Agent Tipton omitted material information regarding Engel's role as an accomplice in crimes charged pertaining to Victim One.   Moreover, even if the affidavit had focused on Mandell's relationship with Engel, this relationship would not have defeated the necessity requirement.  As discussed above, the Seventh Circuit has made clear that the government may meet its burden of establishing necessity where the evidence anticipated from the wiretap is needed to provide the depth, knowledge and guilt of a co-conspirator in the charged offense.  Defendant does not suggest that the government had evidence of Engel's knowledge and participation in the charged offense.

### B. Defendant has Failed to Make a Substantial Preliminary Showing that the Agent Omitted Information for the Purpose of Misleading the Issuing Judge or with Reckless Disregard of Whether the Issuing Judge Would be Misled

Even if the agent omitted the information Defendant claims is material, Defendant has failed to make a substantial preliminary showing that he omitted such information for the purpose of misleading the issuing judge or with reckless disregard of whether the issuing judge would be misled. As the Seventh Circuit has noted, "the evidence must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009), citing *Jones,* 208 F.3d at 607; *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984). Furthermore, "this burden is substantial, and *Franks* hearings are rarely required." *Id.*

The type of evidence Defendant claims the agent omitted does not support a showing that he intentionally did so. The evidence regarding Engel's involvement in the murder of Victim Two is slim, at best, and does not support that the agent would intentionally withhold such tangential evidence potentially linking Engel to another crime that was not the subject of the wiretap. In addition, as discussed above, Defendant has not established or argued that the agent knew about the phone records, thus he could not have intended to mislead Chief Judge Holderman with the information. Finally, Defendant's prior "criminal relationship" with Engel that took place over 30 years ago and was subsequently vacated by reviewing courts simply could not have been omitted to mislead Chief Judge Holderman. It is unfathomable that the necessity requirement would have been defeated with this information. Defendant has not met his burden.

**CONCLUSION**

For the reasons discussed above, the Court denies Defendant's motion to suppress the evidence obtained from the wiretaps at issue. The Court further denies Defendant's request for a *Franks* hearing.

Dated: December 2, 2013

AMY J. ST. EVE
United States District Court Judge