**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| ) | Case No. 12 CR 842 |
| v. ) | |
| ) | |
| ) | |
| STEVEN MANDELL ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Defendant Steve Mandell is charged in an eight-count Superseding Indictment. Trial is scheduled to commence on February 10, 2014. In advance of trial, Defendant filed a motion in limine seeking to exclude certain portions of recorded conversations between Defendant and Individual A. The Court has reviewed the transcripts at issue in their entirety. For the reasons discussed below, Defendant's motion is granted in part, granted in part without objection, and denied in part.

### BACKGROUND

On November 1, 2012, a grand jury returned an Indictment against Steven Mandell and his co-defendant, Gary Engel, charging two counts of extortion under 18 U.S.C. § 1951(a). (R. 13.) The Court subsequently granted the government's motion to dismiss co-defendant Gary Engel from the indictment after he was found dead in his prison cell. (R. 24.)

On March 21, 2013, a grand jury returned an eight-count Superseding Indictment (the "Indictment") against Defendant. (R. 38, Sup. Ind.) The Indictment charges Mr. Mandell with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201 (Count I); conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951 (Counts Two and Three); possessing a

1

firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Four); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Five); obstruction of justice, in violation of 18 U.S.C. § 1512 (Count Six); and murder-for-hire, in violation of 18 U.S.C. § 1958(a) (Counts Seven and Eight).

Count One charges Mr. Mandell with a conspiracy to kidnap Victim One. It alleges an elaborate scheme in which Defendant and co-conspirator Engel agreed to pose as police officers and arrest Victim One, take him to a designated location, torture and extort him, and then murder Victim One and chop his body into pieces. It specifically alleges that Defendant Mandell intended to use threats of force to get Victim One to disclose where he kept bulk cash in his residence so Mandell could steal it. He further intended to use these threats to force Victim One to execute legal documents that would transfer the ownership of certain real estate from Victim One to Defendant Mandell. Defendant and Engel then allegedly planned to kill Victim One, drain Victim One's body of blood, and dismember him. The Indictment further alleges that they "obtained, maintained and used various tools and instrumentalities in order to assist in carrying out the kidnapping, restraint, extortion, torture and murder of Victim 1, including but not limited to: handcuffs, false law enforcement identification documents and badges, a forged arrest warrant, police scanners, walkie-talkies, cellular telephones, a ski mask, a wheelchair, zip-ties, anchors, a firearm, goggles, saws, a butcher block, knives, and a hemostat." (R. 38 at ¶ 8.) Counts Two and Three charge Defendant with extortion and attempted extortion in connection with this conduct targeting Victim One on October 25, 2012.

Count Four charges Defendant Mandell with knowingly possessing a firearm in furtherance of a crime of violence. Count Five charges Defendant with being a felon in possession of a firearm, namely, a Ruger .22 caliber pistol.

Count Six charges Defendant Mandell with obstruction of justice, stemming from his alleged use of the telephone and mail privileges after his initial court appearance on October 26, 2012. (*Id*. at 10.) Counts Seven and Eight charge Defendant Mandell with murder-for-hire. These counts "concern Mandell's participation in the planned murder of a second victim" (Victim Two) so that Mr. Mandell could take control of the revenues from an adult entertainment club. (*Id*. at 13-3.)

## LEGAL STANDARD

Trial courts have broad discretion in ruling on evidentiary issues before trial. *See Jenkins v. Chrysler Motors Corp.,* 316 F.3d 663, 664 (7th Cir. 2002); *United States v. Lillie,* No. 08 CR 717, 2009 WL 3518157, at *1 (N.D. Ill. Oct. 28, 2009). "Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Accordingly, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). An *in limine* ruling avoids delays and allows the parties an opportunity to prepare themselves and witnesses for the introduction or exclusion of the evidence at issue. *See Wilson v. Williams,* 182 F.3d 562, 566 (7th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997) ("The prudent use of the *in limine* motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered by the jury."); *United States v. Connelly,* 874 F.2d 412, 416 (7th Cir. 1989). Ultimately, an *in limine* motion "performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that

clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson,* 115 F.3d at 440.

A party seeking to exclude evidence has the burden of demonstrating that the evidence is inadmissible for any purpose. *United States v Brown,* No. 08-cr-1009, 2011 WL 43048, at *2 (N.D. Ill. Jan. 6, 2011). Regardless of a court's initial ruling on an *in limine* motion, the court may adjust its ruling during the course of the trial. *See Farfaras v. Citizens Bank & Tr. of Chicago,* 433 F.3d 558, 565 (7th Cir. 2006) (citing *Luce,* 469 U.S. at 41-42); *Perry*, 733 F.3d at 252 ("As a trial progresses, the presiding judge remains free to alter earlier rulings."). Furthermore, the court may defer ruling on a motion *in limine* until trial if the parties' arguments "cannot be evaluated accurately or sufficiently . . . in such a procedural environment." *Jonasson,* 115 F.3d at 440.

## ANALYSIS

During the course of the investigation in this case, the government recorded many conversations both through consensual recordings and through wiretap orders. Defendant seeks to exclude certain statements he allegedly made during recorded conversations that took place on the following days: September 22, 2012, September 30, 2012, and October 14, 2012. The Court addresses each challenge in turn.

**I.     Transcript of 9/22/12**

  **A.     Page 9, lines 4-26**

Defendant has asked the Court to preclude the government from introducing the following exchange from the September 22, 2012 recorded conversation:

Mandell:     So do we give him a good, a good phony name with good credit?

Individual A:  Do we have that?

| | |
|---|---|
| Mandell: | Yeah. Bet Joe Fosco would have been fine. Or should I just go in there, but then the criminal background check on me then. |
| Individual A: | No. |
| Mandell: | (Inaudible) go on that. |
| Individual A: | Well I mean, what-you've got Steve Mandell, right? |
| Mandel: | Right. |
| Individual A: | Does that exist? |
| Mandell: | Legally. Steve Mandell. I'm no longer Manning. I'm done with Manning. I've been done with Manning for quite a while. |
| Individual A: | Alright, so Steve Mandell has the credit report? |
| Mandell: | Uh-huh. |
| Individual A: | So you have a social security number? |
| Mandell: | Yeah. Do me. Check me. |
| Individual A: | I'm going to. |
| Mandell: | You're my friend. Check me. See how I look on paper. |
| Individual A: | I'm gonna put it in the application – |
| Mandell: | -Put Steven Mandell. |
| Individual A: | Yes. |
| Mandell: | So you know who I am. |

Defendant argues that because this excerpt references his criminal background and his prior name of Manning, it is both unfairly prejudicial and irrelevant.

The Indictment charges that Defendant intended to take Victim One to the office where they would "hold, torture, extort and murder Victim 1." (R. 38, Sup. Ind. ¶ 3.) It further charges that Mandell entered into a lease for the office on or about September 22, 2012 as an overt act in

5

furtherance of the conspiracy. (*Id.* at ¶ 10(a)). In this challenged portion of the recorded conversation, Defendant discusses with Individual A the lease for this office. During the call, Defendant discusses placing the lease in a fictitious name and undergoing the credit check that will take place to obtain the lease. These statements are directly relevant to Defendant's role in obtaining the lease on the office and are probative of his involvement in the charged scheme and his consciousness of guilt.

In addition, the probative value of Defendant's reference to his criminal background is not substantially outweighed by unfair prejudice because the jury will hear evidence that Defendant has a felony conviction through the parties' stipulation. Indeed, the prior felony conviction is an element of the crime charged in Count Five thus the government will necessarily introduce evidence that Defendant has a prior felony conviction. *See United States v. Carter,* 695 F.3d 690, 701 (7th Cir. 2012) ("the felon-in-possession counts necessarily introduced evidence that each defendant had prior felony convictions"). As such, any reference to Defendant's criminal background will not be unduly prejudicial.

The reference to his prior name of "Manning" is also not unduly prejudicial. As the government notes, it intends to call a witness from the Chicago Police Department to testify that Mandell used to work for the Chicago Police Department under the name of Steve Manning. This evidence is direct evidence of Defendant's role in the charged crime, namely how Defendant gained the knowledge of police practices that he allegedly employed during the course of the conspiracy and how he learned to pose as a law enforcement officer. Defendant's argument that the "danger that the disclosure of the Manning name could or would result in jurors learning about crimes for which Manning was originally convicted (but those convictions were eventually reversed)" is also unavailing. (R. 146, at 2.) In order to obtain such information

about Defendant, the jury would have to look outside of the evidence presented during the course of the trial. The Court will address this concern by repeatedly instructing the jury not to communicate about the case with anyone and not to conduct any independent research regarding the case or any individuals involved in it. It is presumed that juries follow a court's instructions. *United States v. Davis*, 724 F.3d 949, 957 (7th Cir. 2013) (citations and quotations omitted); *United states v. Roux*, 715 F.3d 1019, 1026 (7th Cir. 2013).

**B.      Page 11, lines 18-46 and Page 12, lines 1-43**

Defendant next challenges a portion of the September 22, 2012 recorded conversation pertaining to fake identification documents. During this portion of the recording, Defendant and Individual A discussed the creation of fake law enforcement credentials. The recording captured the following discussion:

Mandell:        Cause I can counterfeit these. Look at this.

Individual A:  (Inaudible).

Mandell:        Look at this.

Individual A:  Now that's not as nice as this picture.

Mandell:        No, I'm talking about – that's counterfeit. I had that done. You like that?

Individual A:  (Inaudible)

Mandell:        You like that?

Individual A:  But no badge, right?

Mandell:        Fuckin' badges. (Inaudible) badges.

Individual A:  No stinking badges. Well, that's a nice picture. Nice suit.

Mandell:        Look, look at this.

Individual A:  One hundred club of Chicago. What is the hundred club? Chicago police.

| | |
|---|---|
| Mandell: | They donate. You know Phil Cline? Remember the name Phil Cline? |

\*\*\*

| | |
|---|---|
| Mandell: | All counterfeit. |
| Individual A: | All counterfeit. Park Ridge, who's this? Illinois State (inaudible). Phillip Cline, senior director former (inaudible) chairman. You should have worked on his belly instead of mine. Fucking fat slob he was. |
| Mandell: | But he's nice. (Inaudible). See? The right card, the right everything. |
| Individual A: | (Inaudible). |
| Mandell: | Hmm? |
| Individual A: | Can I get one? |
| Mandell: | I got a photograph here. What, you want a button like this? |
| Individual A: | Oh I (inaudible). |
| Mandell: | This is not a police badge. It's a mimic. It's the real thing. Phil Cline – These are, there's only a limited amount. And all this is, is that you're a big donator for fallen officers and fallen firemen. Primarily fallen police officers. You're a big donator. You know Gary McCarthy. I mean, you want to talk about the law enforcement, that I'm a big donor for fallen officers. It's just the gift of gab, right? You've got a whole arsenal of gift of gab, don't you? |
| Individual A: | Sure I do. |
| Mandell: | But this is I'm a donor. Should I do that? Should I get that for you? |
| Individual A: | Yeah. |

Defendant argues that the Court should exclude this part of the conversation because it is evidence of another crime and thus inadmissible, it is irrelevant, and its probative value is substantially outweighed by unfair prejudice. The Court disagrees.

The Indictment charges Defendant with conspiracy to kidnap Victim One, and specifically states that it was part of the conspiracy "that one or more of the conspirators

obtained, maintained and used various tools and instrumentalities in order to assist in carrying out the kidnapping, restraint, extortion, torture and murder of Victim 1, including but not limited to: handcuffs, false law enforcement identification documents and badges …." (R. 38, Sup. Ind. ¶ 8.) Furthermore, when the law enforcement agents arrested Defendant on October 25, 2012, both Defendant and co-conspirator Engel had fake law enforcement credentials. Specifically, Engel had a fake Deputy United States Marshal photo and badge and Defendant "was wearing a Cook County Sheriff's lanyard, with a Cook County Court Services photo identification hanging from it." (R. 1, Complaint at ¶ 27.) The name on the photo identification was "Robert Johnson." (*Id.*)

The challenged portion of the recorded conversation, which took place while Defendant was planning the alleged kidnapping in Count One, is direct evidence that Defendant had fake law enforcement credentials that he could use as a tool to carry out the charged conspiracy to kidnap Victim One.

Moreover, even if this aspect of the conversation was not direct evidence, the Court would admit it under Rule 404(b) to establish Defendant's opportunity, preparation and plan. Rule 404(b) provides that courts may admit other acts evidence to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed. R. Evid. 404(b); *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013). *See also United States v. Hensley*, 574 F.3d 384, 388 (7th Cir. 2009). In determining whether evidence is admissible pursuant to Rule 404(b), the Seventh Circuit has adopted a four-part standard, assessing whether:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the

9

defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*Hensley*, 574 F.3d at 388-89 (quoting *United States v. Diekhoff*, 535 F.3d 611, 617 (7th Cir. 2008)). *See also Garcia-Avila*, 737 F.3d at 490. First, Defendant's statements regarding the fake law enforcement identification documents are directed toward his opportunity, plan and preparation in creating some of the tools and instrumentalities at issue in this case. Second, the evidence is similar to the use of fake identification documents in this case and the conversation took place during the planning of the kidnapping charged in this case. Third, Defendant's own recorded statements are sufficient to support a jury finding. Finally, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice because it goes directly to the charged conduct in this case. Moreover, the Indictment charges Defendant with violent crimes, including conspiracy to commit kidnapping, conspiracy and attempted extortion, possessing a firearm in furtherance of a crime of violence, being a felon in possession of a firearm, and murder-for-hire. The non-violent nature of the evidence of creating other false law enforcement credentials pales in comparison to the nature of the charges and thus is not logically likely to cause the jury to rely on it as proof of Defendant's propensity to commit the underlying violent offenses. The Court, therefore, denies this aspect of Defendant's motion.

**C.     Page 41, lines 41-42**

Defendant has moved to exclude the following statement:

Mandell:     Can you keep your mouth shut, I'm begging ya. This is, is your dick getting hard? Is your dick getting hard?

Defendant argues that this "reference to the state of personal anatomy is not relevant." (R. 146 at 3.) Defendant makes this statement to Individual A after discussing his ability to track individuals through a tracking device that he can monitor on the internet. During the

conversation, Defendant Mandell demonstrates how the tracking device works and the information he can obtain from it. He then makes the above comment to Individual A. When viewed in the context of the transcript, this statement is not simply a reference to "personal anatomy" as Defendant contends. Instead, the phrase is a metaphor apparently understood by both sides of the conversation as an expression of Defendant's enthusiasm and eagerness regarding his ability to track and monitor his targets. The Court, therefore, denies Defendant's request to exclude this portion of the recording.

## II.  Transcript of 9/30/12

### A.  Page 16, line 46- Page 17, line 10 & Page 17, lines 31-35

Mandell:    Well, he was a—This is a murder investing-? Huh.

Mandell:    This is critical. These are legal matters. I don't involve myself in legal matters. I have lawyers that attend to this. But gladly to handle all your questions, now leave. F. Lee Bailey wouldn't let you answer a question, would he? What would Ray Smith say to you? "Shut the fuck up, …. You're not gonna talk to this fucking Pollack detective." Stanley Budzinsky from Area Six. "Get the fuck out of my office with all due respect. Here's the lawyers. Call any one of 'em you want."

*** 

Mandell:    How the fuck? You better go through secretaries; you better go through a lot of channels. You don't have access to me. That's why poor people have to put up with cops. They come up to your door. (Knocking sound). But the big people-

Defendant objects to the repeated references to remaining silent and letting the lawyers handle everything. He further objects to admission of his derogatory statements about the "f…. Pollack detective" and poor people not having lawyers given the potential composition of the jury. The Court agrees in part.

Defendant's repeated directions to Individual A about how he should react if the police approach him after the murder of Victim Two are probative of Defendant's intentions and the

11

amount of planning he put into committing the alleged offense. His words are also relevant to the efforts he undertook to avoid detection by law enforcement. The fact that Defendant repeated this direction to Individual A on numerous occasions is relevant to the importance Defendant placed on his advice and avoiding detection by law enforcement. In addition, the first line of the excerpt refers to a murder investigation. Given the charges in this case, such a statement is probative of Defendant's knowledge and involvement in the charged crime. The Court, therefore, denies Defendant's request to exclude these portions of the recordings. The government is free to admit the numerous times Defendant repeats these admonitions.

Furthermore, the Court will instruct the jury regarding Defendant's rights in the case. Defendant's concern, therefore, that these statements may cause the jury to conclude that he is "hiding behind his lawyers" is unavailing.

The government may not, however, admit the derogatory references to the "f…. Pollack detective" and to poor people not having lawyers. Such statements are irrelevant to the issues before the jury. Furthermore, even if they were relevant, any probative value they may have is substantially outweighed by the danger of unfair prejudice.

**B.     Page 20, lines 29-47 through Page 21, line 34**

Defendant challenges the admission of the non-italicized statements from the September 30, 2012 recorded conversation:

*Mandell:*    *Well uh, I spar with you like this all the time. Like I told a lot of guys: "If you're arrested, in a station at the federal building. Shhhh." What would F. Lee Bailey say to you? "I'm on my way.…" What would F. Lee Bailey say to you?*

*Individual A:*    *"Shut your mouth."*

*Mandell:*    *"Shut the fuck up, will you?" Button up your ego and quit trying to explain yourself to people that you're not gonna impress.* Everything you say will be used against you and shoved up your ass. So why, you don't

12

      have to, you don't have to – But Obama's gonna be in the interrogation. Fuck Obama. You don't have to talk to him either. You are protected by the Constitution. They just read your rights. You have the right to remain silent. That's the one I like.

Individual A: (Laughing)

Mandell: I pick that one. "You just told me I didn't have to talk." I (inaudible).

Individual A: I'm sorry Steve, I have to laugh sometimes cause you are comical.

Mandell: I –

Individual A: It's serious, but don't get me wrong. I mean, no disrespect. That's the one I like.

Mandell: You don't have to explain yourself to anybody in this country. If you had an IRS case and I'm your lawyer, it's a white collar situation. They charged you with uh, dash one of the IRS case, …. You had bingo all and all that bull. Whatever. They charged you. Okay? So we're gonna go to court. I haven't' decided if you're gonna take the stand. You may not explain anything.

Individual A: Normally you wouldn't, right?

Mandell: Well the judge is'' We're in court. The judge is gonna tell you. He's – You are not obligated to take the stand. You're presumed innocent. I'll fight this case and make them prove their case. You don't have to say a word in the court room.

Individual A: Nor would I.

Mandell: Not guilty, your honor.

Defendant asks the Court to preclude the admission of this exchange because "the way [the statements] are discussed by the defendant greatly demeans these rights' significance …." (R 146 at 4.) For the same reasons discussed above, these statements are proof of Defendant's directions to Individual A on how to act if law enforcement approached him in order to avoid detection of the murder of Victim Two. The Court, therefore, denies this aspect of the motion.

13

### III. Transcript of 10/14/12

#### A. Page 9, lines 34-38

Because the government has agreed to redact the challenged excerpt from this call, the Court grants this aspect of the motion without objection.

#### B. Page 13, lines 22-35

Defendant has moved to exclude the italicized portion of the following exchange in the recorded conversation from October 14, 2012:

> *Mandell:*     *Okay. That don't make sense to me. The United States Attorney's Office comes down, boom, like a sledge hammer. They know the whole – They know every phone call these guys have made.*
>
> *Individual A:*     *Hold on one second. Yeah, I'm listening.*
>
> Mandell:     *They have a whole overview of what goes on over there. They know. They've got a fucking chart, blam, like this, that bah boop, they got it all. All the phone records. They've got the pie charts, they know exactly, the dad, the daughter, the wife, they know everything. They have – When they come at you, they come at you.* What can these guys give them when this is a bigger? If they can blow up this fuckin' town, this is a feather in their cap. What bookies are left out there? Who? Ray Ray from Chinatown? You know, a few guys. It doesn't make any sense, even because these guys are thriving. Not only they're just – If that was true they would be hanging around Polekatz feeding people to the lions, right? But instead they are fucking expanding.
>
> Individual A:     Doesn't make sense, right?

Defendant contends that this conversation is "an irrelevant discussion of legal matters." He further argues that Rule 403 precludes its admission because the discussion about the United States Attorney's Office "implies previous and inadmissible cases." (R. 146 at 4.)

During this conversation, Defendant and Individual A discuss whether Victim Two and his associate are cooperating with federal law enforcement. In the challenged excerpt of this conversation, Defendant explains to Individual A that he does not believe that Victim Two is

14

cooperating with the federal government. This evidence is relevant to Defendant's intent to murder Victim Two given the reasonable inference that he did not have to worry about a federal investigation over the murder of an informant because Victim Two was not an informant.

Defendant's argument that this passage "implies previous and inadmissible cases" fares no better. The jury will hear evidence that Defendant previously worked in law enforcement. In addition, the jury will hear Defendant's own statements regarding the practices of law enforcement officers. Defendant's law enforcement experience and knowledge of law enforcement practices provide a sound inference for his knowledge of the United States Attorney's Office.

### C. Page 19, lines 14-15

Defendant seeks to exclude the following excerpt from this transcript:

Mandell: I look like John Holmes, man my dick is so big and hard right now.

Defendant made this statement on October 14, 2012. The Indictment alleges that on this day Defendant "discussed the planned abduction of Victim 1, and also discussed the murder of an heir of Victim 1 who was in a position to make a claim to Victim 1's real estate after Victim 1's death." (R. 38, Sup. Ind. ¶ 10(e)). In the recorded conversation, Defendant just learned that Victim One's wife has passed away and that Victim One's daughter was his only heir. Individual A tells Defendant that Victim One is "all by himself." Defendant makes the above challenged statement in response to this information eleven days before the Indictment charges that he attempted to carry out his plan of kidnapping, extorting, torturing and killing Victim One. Defendant now asks the Court to exclude this reference because it refers to "the state of one's anatomy in a sexual context, and is simply irrelevant." (R. 146 at 4.)

15

Given the context in which Defendant made this statement, the Court is hard-pressed to find it "simply irrelevant." Although the statement is sexual in nature, it is proof of Defendant's reaction to the news that Victim One – whom Defendant is charged with conspiring to extort of cash and real estate – lived alone and did not have any heirs living with him. The statement is direct proof of Defendant's involvement in the charged conspiracy to kidnap and extort Victim One. The Court, therefore, denies Defendant's request to exclude this portion of the October 14, 2012 recording.

## CONCLUSION

For the reasons discussed above, the Court grants in part, grants in part without objection, and denies in part Defendant's Motion in Limine Regarding Redactions from Recordings.

**DATED: January 23, 2014**  **ENTERED**

_____
AMY J. STUEVE
U.S. District Court Judge