# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA     )
     )
     )
     )     Case No.  12 CR 842
     v.     )
     )
     )
STEVEN MANDELL     )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Steven Mandell has moved for a judgment of acquittal, or, in the alternative, a new trial on Counts One, Two, Three, Four, Five, and Six of the Superseding Indictment. For the reasons explained in detail below, the Court denies Defendants' motions.

## BACKGROUND

On November 1, 2012, a grand jury returned an Indictment against Steven Mandell ("Mandell", or the "Defendant") and his co-defendant, Gary Engel ("Engel"), charging them with two counts of extortion under 18 U.S.C. § 1951(a). (R. 13.) The Court subsequently granted the government's motion to dismiss co-defendant Gary Engel from the indictment after he was found dead in his prison cell. (R. 24.)

On March 21, 2013, a grand jury returned an eight-count Superseding Indictment against Defendant Mandell. (R. 38, Sup. Ind.) The Superseding Indictment charged Mandell with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201 (Count I); conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951 (Counts Two and Three); possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Four);

being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Five);

obstruction of justice, in violation of 18 U.S.C. § 1512 (Count Six); and murder-for-hire, in

violation of 18 U.S.C. § 1958(a) (Counts Seven and Eight).  The Superseding Indictment also

contained a forfeiture allegation.  Defendant pled not guilty to each of the counts in the

Superseding Indictment.

After extensive pretrial litigation, Defendant proceeded to a two week jury trial.  During

the course of the trial, the government called the following witnesses:

Chicago Police Department Sergeant Michael Barz,
Rosemary Hollman, Administrative Assistant to the Chief of Police at the Willow
        Springs Police Department,
Rosemarie Nolan, the Cook County Sheriff's Department's Deputy Chief of Human
        Resources,
Deputy US Marshal Christopher Shaw,
FBI Special Agent Richard Tipton,
FBI Special Agent Sean Burke,
FBI Special Agent Courtenae Trautmann,
FBI Special Agent Luigi Mondini,
FBI Special Agent Christopher Mackey,
Theresa Hammonds, Courtroom Deputy Supervisor for the Northern District of Illinois,
FBI Special Agent Joseph Raschke,
FBI Special Agent David Ostrow,
FBI Special Agent Carey Pleasant,
Dr. Darwin Eton, a hematologist,
FBI Special Agent Patrick Staehely,
FBI Special Agent David Bennett,
FBI Special Agent Christine Awender,
FBI Special Agent Derek Skievaski,
FBI Special Agent Paul Fairbanks,
FBI Special Agent Kenneth Wheeler,
FBI Special Agent David Harris,
Shane Larkin, FBI Investigative Specialist,
FBI Special Agent Alan Ayars,
Lynette Kallas,
Ben Minow from Chicago Uniform,
FBI Special Agent Douglas Seccombe,
Mara Wasar from AT&T,
FBI Special Agent Mary Harris,
FBI Special Agent Anne Rackers,

Steven Campbell,
John Federis from CovertTrack Group,
Douglas Halepaska, an FBI Firearms Examiner,
FBI firearms examiner Nikkola Russell,
FBI fingerprint analyst Richard Roman,
Vicente Blas, Special Investigative Support Technician from the Metropolitan
      Correctional Center,
FBI Special Agent Mailin Chuy-Horn, and
FBI Special Agent Gregorio Miceli.

Defendant Steven Mandell also testified at trial. Defendant did not call any additional witnesses.

The jury returned a verdict of guilty against Defendant on Counts One through Six of the Superseding Indictment and not guilty on Counts Seven and Eight of the Superseding Indictment. Defendant now moves for a judgment of acquittal or new trial on the counts of conviction[1].

## LEGAL STANDARD

## I.      Motion for Judgment of Acquittal – Rule 29

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When, as here, a defendant makes a Rule 29(a) motion at the close of the government's case, and

---

[1] Shortly after Defendant Mandell's first appearance in court after the FBI arrested him on the complaint, the court appointed Keith Sielfogel from the Federal Defender Panel to represent Defendant. (R. 9.) Mr. Spielfogel represented Defendant throughout the trial in this case. Given the complexities of the case, the Court granted Mr. Spielfogel's motion for appointment of a second counsel on the case, and appointed Robert Loeb. (R. 30.) After trial, Defendant made accusations against his attorneys that resulted in the Court granting their motions to withdraw and appointing Frank Lipuma to represent Defendant. (R. 223, 227.) Mr. Lipuma has represented Defendant since May 27, 2014. When Mr. Lipuma came into the case, Mr. Spielfogel already had filed the present motion, but not the reply brief in support of it. Mr. Lipuma filed several motions for an extension of time to file Defendant's reply brief, all of which the Court granted. The Court was surprised to see counsel's representation in the reply brief that he "has not had sufficient time to completely review all of the discovery and other important materials in this case." (R. 243.) Mr. Lipuma did not seek more time to file the reply. The Court respectfully disagrees with this statement given that Mr. Lipuma, who is very skilled, diligent and talented, has had multiple extensions and approximately four and one half months to file the reply brief.

the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d at 546 (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012); *United States v. Dood*y, 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt"). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard is recognition that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

## II. Motion for a New Trial – Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see also Berg*, 714 F.3d at 500; *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005). "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'" *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

"'A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). The court may grant a new trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the interest of justice.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a

new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); *see also United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). Put another way, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)). *See also United States v. Presbitero*, 569 F.3d 691, 706 (7th Cir. 2009).

## ANALYSIS

**I. The Evidence Was More than Sufficient to Sustain the Guilty Verdicts[2]**

Defendant argues that the evidence was not sufficient to sustain the guilty verdicts against him on Counts One through Six. The Court disagrees. During the course of the trial, the evidence overwhelmingly showed that Mandell plotted with his co-defendant Gary Engel as follows:

Mandell and Engel developed a plan to kidnap and extort Steven Campbell ("Campbell"), an owner of a significant number of rental properties. Mandell and Engel agreed to pose as law enforcement officers, and arrest Campbell with a fake warrant Engel had created bearing the forged signature of a federal judge. They planned to take Campbell to 5308 West Devon in Chicago, a location that Defendants outfitted for the express purpose of killing Campbell and that Mandell chillingly referred to as "Club Med." Once they brought Campbell to Club Med, they planned to cover his face with a ski mask, forcibly restrain him with handcuffs in a

---

[2] The jury convicted Defendant of counts one through six of the Superseding Indictment. Defendant does not raise any challenges to the sufficiency of the evidence regarding Count Six, obstruction of justice. The Court, therefore, does not address the evidence that was more than sufficient to support the jury's verdict as to Count Six.

wheelchair, torture him with a razor blade (including mutilating his genitals), make him sign over his real estate holdings and reveal the location of money hidden in his home, and then ultimately kill and dismember him.

The FBI intercepted Mandell and Engel on their way to meet Campbell on October 25, 2012. Mandell was dressed as a law enforcement officer, and possessed a fake Cook County Sheriff's identification card with his picture and the phony arrest warrant for Campbell. On Mandell's person, agents recovered black gloves, a flashlight, and an Airsoft pistol BB gun. Engel also had false law enforcement identification, and possessed a stun gun and handcuffs. At Club Med, the FBI recovered (among other items) a wheelchair, a ski mask, zip ties, bags of disposable gloves, plastic goggles, large plastic sheets, garbage bags, a loaded Ruger .22 semi-automatic pistol, a knife, hemostats, and a meat cleaver.

The government's evidence was exceptionally strong. The government proved its case through, among other things, numerous witnesses, consensual calls with a cooperating witness, video and audio records from a Title III wiretap at Club Med, the evidence recovered from the execution of a search warrant at Club Med, and the evidence regarding Defendant's actions and statements. The Court discusses the evidence in further detail below, which it organizes into four categories: a) consensual calls between Mandell and cooperating witness George Michael; b) Title III evidence obtained from Club Med; c) the arrest of Mandell and Engel; and d) the search of Club Med. Viewing the evidence in the light most favorable to the government, a rational trier of fact easily could have found the essential elements[3] of the crimes at issue beyond a reasonable doubt.

---

[3] Regarding Count One, the "elements of the offense of kidnapping under 18 U.S.C. § 1201(a)(1) are: (1) that the defendant knowingly and willfully seized, confined, kidnapped, abducted or carried away a person as charged; (2)

## A. The Consensual Calls with George Michael

Significantly, the government introduced a substantial amount of consensual recordings between George Michael ("Michael"), the government's cooperating witness, and Defendant in which Defendant openly discussed his plan to kidnap Steven Campbell[4]. George Michael met Defendant in July of 2012 through mutual acquaintances, and Mandell told Michael that "he was my new doctor and would take care of all my problems." (Transcript of the Trial ("Tr.") at 188.) Defendant and Michael subsequently had conversations regarding Steven Campbell in which Defendant told Michael that "I'm going to need your help with something" after he showed him a picture of Mr. Campbell's home. Defendant told Michael that he had been watching Mr.

---

that the defendant held such a person from the kidnapping; and (3) that such person was thereafter transported in interstate commerce while so confined, or kidnapped." *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003). In order to prove conspiracy to kidnap Steven Campbell, the government had to prove the kidnapping conspiracy charged in Count One, that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy, and that one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy. The government also had to prove that Defendant intended for the kidnapping of Steven Campbell to occur.

As to Count Two, the government had to prove the following elements beyond a reasonable doubt: 1) the conspiracy as charged in Count Two existed; and 2) Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy. Count Three of the indictment charged Defendant with attempted extortion. The government had to prove the following elements: 1) that Defendant knowingly attempted to obtain money or property from Steven Campbell's business or Steven Campbell, the business owner; 2) that Defendant did so by means of extortion by threatened force, violence, or fear, as those terms are defined in these instructions; 3) that Defendant believed that Steven Campbell's business or Steven Campbell would have parted with the money or property because of the extortion; and 4) that the conduct of Defendant affected, would have affected or had the potential to affect interstate commerce. Seventh Circuit Pattern Criminal Jury Instructions, § 1951. The government also had to prove that the victim's fear would have been reasonable under the circumstances.

Regarding the firearms charge in Count Four, Section 924(c)(1)(A) "provides that 'any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm' shall be subject to mandatory penalties. For this offense, 'possession can be either actual or constructive.'" *United States v. Cejas*, 761 F.3d 717, 727 (7th Cir. 2014) (citations and quotations omitted). The crimes charged in Counts One, Two, and Three each qualified as a crime of violence.

In order prove that Defendant Mandell was a felon in possession of a firearm as charged in Count Five, the government had to prove that Mandell "possessed a firearm that had traveled in or affected interstate commerce, and also that he had the requisite felony…." *United States v. Bloch*, 718 F.3d638, 642 (7th Cir. 2013). The firearm at issue was the .22 Ruger.

---

[4] Defendant contends that the fact that the FBI did not record numerous calls between Defendant and Michael and the fact that Michael did not always follow the FBI's directions renders the calls an "utter lack of credible evidence." (R. 243 at 5.) Not only does this argument fail, but it fails to recognize the extensive wiretap evidence discussed below in which Michael was not a participant to the conversations.

Campbell, including sitting in the front of his house and monitoring his activities. Defendant

knew Campbell had money and owned a significant amount of rental properties. In addition,

Defendant told Michael that he wanted Michael, who was active in real estate, to lure Mr.

Campbell out of his home and to Michael's office so Defendant could pose as a police officer

and pretend to arrest Mr. Campbell. Once he handcuffed Mr. Campbell and put him in the back

of his car, Defendant intended to "take him to a location where he could extract and extort his

money." (Tr. 203.) Defendant repeatedly referred to Mr. Campbell as "Soupy Sales, Soupy

Kitchen, Soupy" in reference to his "last name being Campbell." (Tr. at 204, 306.)

During these numerous conversations, Defendant disclosed to Michael that he had an

accomplice who would help him carry out his extortion plan, but he told Michael that he would

not reveal his accomplice's name. Defendant also explained his alibi to Michael:

> The alibi would be that upon the abduction of Mr. Campbell, he would drop off
> Mr. Campbell at the location where he would be murdered; circle back to my
> office; pick up Mr. Campbell's cell phone, keys; drive his car – 'his car' being
> Mr. Campbell's – back to his home, where he would make multiple telephone
> calls so that the cellular towers would indicate that Mr. Campbell was still alive
> and well.

(*Id.* at 205.)

### 1.    The Details of the Plan

Defendant and Michael had numerous recorded conversations in which Defendant

discussed the details of his plan. The government introduced these recordings into evidence. On

September 30, 2012, for example, Mandell told Michael the details of his scheme. Defendant

also discussed how he intended to have a phony arrest warrant to arrest Mr. Campbell when

Campbell arrived at Michael's real estate office. (*Id.* at 319.)  Mandell told him that he would

meet Campell at Michael's office, and "deposit him over here with my associate", at Club Med.

Mandel even mapped out the distance from Michael's office to Club Med as 1.3 miles. (*Id.* at 317.) He explained that his accomplice would keep Campbell at Club Med. Mandell, in the meantime, intended to take Campbell's car and phone and continue to make calls or place texts from the cell phone so it looked like Campell was using it. (Tr. 318-19; 9/30/12 Recorded Call.) He further intended to drive Mr. Campbell's car to Campbell's home and continue placing phone calls. (Tr. at 320, 326.)

### 2. Prior Contact with the Victim

During these conversations, Mandell told Michael that he had tried to get Campbell earlier. Steven Campbell testified at trial, and he corroborated Mandell's statement. Specifically, Campbell testified that during the first week of October in 2011, he received a handwritten letter in the storm door at his residence. The letter said "Hi, Steven. Stopped by this morning. Wanted to know your current thoughts about 8934 Ogden. Please give me a call." Campbell owned the 8934 Ogden property. The letter, which the government introduced at trial, also had a business card enclosed with it with a phone number from an out of state area code. (Gov. Ex. Campbell 1.) The business card contained Steven Mandell's name. (*Id.*) Campbell called the number twice. Campbell became concerned based on Mandell's answers during these conversations regarding how he had located Campbell's home. (Tr. at 1190.) Campbell had never heard of Mandell at the time. Because of his concerns, Campbell took the letter to the Riverside Police Department and handed it to the Chief of Police.

### 3. Club Med

Despite his lack of success in 2011, Mandell continued to pursue Campbell. Mandell knew the color and type of Campbell's car because he had been watching him. (*Id.* at 302-03.) Mandell had multiple discussions with Michael regarding "Club Med" – a location he asked

Michael to help him find.  Michael found 5308 West Devon for Mandell to rent, and Mandell signed a lease for it.  (Gov. Ex. Lease 1.)  Mandell told him that he would "change the locks and all that stuff" at the location.  (Tr. at 286.)  The front of the building had a sign that read "Christian Consulting, By appointment only."  (*Id.* at 373; Gov. Ex. Devon Photo 4.)  During the recorded conversations, Mandell talked a significant amount about the items he wanted in Club Med to carry out his scheme.  He wanted a big "double sink" that he could use to "drain the victims' blood" after he tortured and killed them.  (Tr. at 272-7.)  In an October 4, 2012, consensual recording, Mandell told Michael that he wanted a "big counter" put in Club Med, "like a meat cut-Like a meat cutting block."  (*Id.* at 362.)  He also wanted a "big sink" a "two compartment sink" put next to it.  (*Id.* at 365.)  The evidence demonstrated that Mandell wanted the counter next to the double sink in order to place Campbell's body on it and dismember it.

### 4. The Accomplice

Mandell continued to discuss his plan to kidnap and murder Campbell with Michael. Although Mandell told Michael that he had a "partner" who would help him with the murder and dismemberment at Club Med, Mandell intentionally never disclosed Engel's identity to Michael. (*Id.* at 306-07, 385, 474-75.)  During a recorded conversation, Mandell even told Michael that he would never know his partner.  (*Id.* at 307.)  He further told Michael that he did not want him present at Club Med.  (*Id.* at 307.)

### 5. The Victim's Heirs

In a subsequent recorded conversation with Michael, Defendant learned that Campbell's wife had recently passed away and that Campbell's daughter was his only remaining heir. Defendant expressed his excitement that Campbell only had one heir who might legally challenge Defendant's claimed right to Campbell's property.  Mandell told Michael that if the

daughter came around and challenged him "she's gone. If I find out where she's at, look out. There is nobody on that playing field." (10/14/12 Transcript at 26.) Mandell then made a slashing gesture across his throat. In short, if Campbell's daughter interfered with Mandell's plan to keep Campbell's property, Mandell would kill her. (Tr. at 460-62.)

### 6. Further Details of the Scheme

Defendant photographed Campbell's properties and obtained fake quit claim deeds and a power of attorney form that he intended to force Campbell to sign. The government introduced this documentation into evidence at trial. (*Id.* at 446-53; Gov. Ex. Crown Vic 7-B, 7-C, 7-D, 7-E, 7-F). The documents transferred the property to Mandell. Mandell told Michael that he had picked the right target based on Campbell's wealth.

During the recorded calls, Defendant also discussed what they intended to do to Campbell at Club Med. He explained that they would have Campbell handcuffed and blindfolded. (Tr. at 322-23.) Mandell "starting moaning" to describe Mr. Campbell "suffering" and made noises to describe him "defecating upon himself" from the torture. (*Id.* at 323, 330-31.) Defendant had the double sink and long counter installed at Club Med to assist in the torture. (Gov. Ex. Devon Photo 68.) Mandel subsequently told Michael that his "associate" "knows how to waterboard, do interrogation." (Tr. at 385; 10/4/12 Transcript at 4).

The evidence, including the recorded conversations, captured Defendant consistently using code words, hushed tones, hand gestures and facial expressions to communicate with Michael. Defendant did not, however, reveal Engel's identity to Michael. Defendant told Michael that his associate was going to help him with the kidnapping and extortion plot, but he was cautious not to reveal Engel's identity to him. In fact, he told Michael that he never would know Engel's identity.

## B. Title III Evidence from 5308 West Devon

In addition, the government introduced both oral communications and visual, non-verbal conduct intercepted pursuant to Title III wiretaps at Club Med, located at 5308 West Devon in Chicago. Specifically, the government obtained wiretaps to intercept oral communications and visual, non-verbal conduct at 5308 West Devon. They introduced the audio and video recordings captured on October 23, 2012 through October 25, 2012 – the day Defendant and Engel intended to carry out their extortion and torture plot. These recordings provided overwhelming evidence against Defendant Mandell and corroborated the testimony of George Michael. These recordings captured the raw discussions between Mandell and Engel in which they elaborated on the intricacies of their kidnapping and extortion plot and the care and detail they put into the plan. The videotapes further captured these co-defendants bringing the tools of their plot into Club Med and the excitement on their faces at the prospect of carrying out the scheme.

The wiretap evidence revealed Defendant and Engel discussing the details of their plan over a three day period. They openly discussed: 1) the preparation of Club Med for the restraint, torture, murder and dismemberment of Steven Campbell, including the installation of the large sink and the need for hot water; 2) their elaborate plan to pose as law enforcement officers when they abducted Campbell; 3) what they planned to say when they approached Campbell; 4) their use of handcuffs and a fake arrest warrant with the fake "signature" of Judge Zagel; 5) how they intended to respond to law enforcement officers if they approached them during the abduction; 6) how they intended to restrain Campbell during the plot and their intent to cover his face with a ski mask; 7) their use of a firearm, if necessary, when abducting Campbell; 8) where they intended to place Campbell at Club Med and the location of their interrogation of him within the facility; 9) the methods of torture they intended to implement if Campbell failed to provide

information regarding the location of his assets; 10) the methods they intended to utilize to taunt and interrogate Campbell; 11) their methods to subdue and kill Campbell, including through the use of sleeping pills; 12) their plan to dismember Campbell's body after they murdered him; 13) their efforts, including placing plastic covering on the walls to capture the blood splatter, to avoid leaving any evidence of the crime at the scene; 14) how they intended to transport Campbell to Club Med and how Defendant planned to travel to his residence; 15) Mandell's plan to break into Campbell's residence and his intent to return Campbell's cell phone and car to Campbell's residence; 16) the fact that Club Med is disguised as Christian Consulting; and 17) their efforts to conceal their criminal activity. (Gov. Exs. 5308 West Devon 10/23/2012 Transcript, 5308 West Devon 10/24/2012 Transcript, 5308 West Devon 10/25/2012 Transcript.)

On October 23, 2012, for example, Mandell tells Engel that "[w]e want to be able to secure [Campbell] while he's sitting down. We don't want him laying. We're not doing spread-eagle." (Gov. Ex. 5308 West Devon Transcript 10/23/2012 at 11.) They then discuss securing Campbell in the wheelchair. (*Id.*)

When discussing Campbell's abduction, Mandell told Engel "Yeah, he is going to have a ski- , uh, ski mask over his face. It's going to be darkness, he's you know, it's going to be psychological warfare. He's going to be in the dark. He's not going to get to look at you and fall in love with his captor. He's going to be in the dark." (Gov. Ex. 5308 West Devon 10/23/2012 Transcript at 14.)

The next day, Mandell and Engel discussed dismembering Campbell:

ENGEL:      Umm, I got this. I got bigger tie--, I got extra tie-wraps. I got those, I got extra blades.

MANDELL:     Okay, where are you going to do the deed on this guy?  You want to get him up here on the counter top?  You wanna put 2x4's over here?  Cause we don't want (thudding sound) to be cutting into here.

ENGEL:       Well I'm wondering.

MANDELL     (Inaudible) there is a very nice bucket for clean up.

ENGEL:       What do you think – If we should just lean him across this?  Just let him drain.

MANDELL:     Okay.

ENGEL:       (Inaudible)  I'm just saying lay him across.

                         *****

MANDELL:     Right.

ENGEL:       You lay him across here, head up here –

MANDELL:     He's down, yep –

ENGEL:       -- head up here, ass right here  (inaudible).

MANDELL:     He's dead weight now.  Whap.

                         ****

ENGEL:       (inaudible)  bleed, drain.

ENGEL:       Let his ass sag.

MANDELL:     You want him, you want him to bleed out.

ENGEL:       Yeah, and you want to let him drain.

MANDELL:     Correct.

ENGEL:       So we can leave him here.  Then –

MANDELL:     But as soon as he bleeds out in about a half hour, we want to straighten him out.

ENGEL:       Okay.

MANDELL:     I don't want a curled body.  Because he's going to be like this then.

ENGEL:       Right, no … we just lay him up here, you get plastic – HERE.  Just cut him.

MANDELL:     But you're not going to be doing any dinning over here.

ENGEL:       Fuck no.  But at least we don't have a big mess though.

MANDELL:     It's all about congealing –

ENGEL:       (Inaudible).  We need something to hold a bag over near the garbage bags.

MANELL:      I'm going to get a container.  I just … get out of here.

ENGEL:       Just one of those little metal wire things you lay a bag over.

(Gov. Ex. 5308 West Devon 10/24/2012 Transcript at 15-16.)

Mandell tells Engel that "we will do this tomorrow.  At 6:00, he's supposed to be there." (*Id.* at 31.)  Mandell then tells Engel "this is the way it's going to go." (*Id.* at 30.)  They will have the fake arrest warrant.  Mandell explains how he is going to approach Campbell at his "friend's" office with the warrant, ask him "Are you Mr. Campbell?", read him his rights, and put the "Smiths" on him.  (*Id.* at 32.)  "We're going to cuff him up, we're going to do our speech."  (*Id.* at 33.)  Engel tells Mandell, "you can cuff him to the front, and you can anything, and just – a towel – or anything, and just wrap it over the cuffs and walk him out."  (*Id.* at 34.) They then discuss whether they should be "Cook County" or "U.S. Marshals."  (*Id.* at 35.) Mandell tells Engel that Engel will drive and Mandell will be in the back seat with Campbell. (*Id.* at 36.)

Mandell and Engel also engage in the following conversation about cutting Campbell's bones:

MANDELL: … So the evening' going to be just talking to him normally. We're not going to do no sawing at 4 in the morning with this guy. …

ENGEL: I'd get yourself some of these if I were you.

MANGELL: Huh?

ENGEL: I'd pick yourself up something like this if I were you. Or those wrap-around glasses.

*****

MANDELL: Now that's the thing about the saw. Is that going to be flinging stuff all over the place?

ENGEL: No.

MANDELL: … you have that propeller-type shit?

ENGEL: No, no (inaudible) hand saw. (Inaudible) we're taking the big bones out, I mean, that's…

MANDELL: Oh, you brought that for the heavy duty stuff.

ENGEL: Yeah. Umm.

MANDELL: Oh, okay.

ENGEL: You, you don't want though, you don't want anything ---

MANDELL: If you've got another pair, grab me…

ENGEL: -- anything squirting.

MANDELL: If you grab 'em by the house, great.

ENGEL: You want to protect your eyes from squirting.

(*Id.* at 45-46.)

On October 25, 2012 – the day Defendant intended to abduct Mr. Campbell and carry out his scheme with Engel – Defendant and co-schemer Engel met again at 5308 West Devon to discuss the details of their criminal plan. Mandell told Engel that he wanted to run the plan past

17

him: "You're driving; I'm going to do the spiel in the office right?  I'm going to go right (inaudible) talk to him; 'Campbell, I'm Bob Johnson from Cook County Sherriff's Department, you've been indicted by a federal grand jury and I have an arrest warrant.'" (10/25/12 Gov. Ex. 5308 West Devon Transcript at 23.)  Mandell then reads the phony arrest warrant: "You are commanded to take into immediate custody Steven Campbell for the charges of felony distribution of cannabis sativa under federal grand jury indictment da da da da dated October 24th Honorable Zagel."  (*Id*. at 24.)  He then told Engel, "Oh you're a bad motherfucker.  Are you a bad motherfucker."  Mandell even tells Engel that he is going to bring a ziplock bag to "inventory" Campbell's personal items.

Engel tells Mandell that he might kill Campbell before Mandell returns to Club Med if Mandell is able to find the cash at Campbell's home.  (*Id*. at 27.)  Engel complains that he "made me sit out there for all them days."  (*Id*. at 28.)

In discussing the torture and dismemberment, Mandell and Engel continue to express their concern about Campbell's blood splattering when they dismember him.  They do not want to leave any forensic evidence at Club Med.  They engage in the following exchange:

ENGEL:     We're going to need it in here.  We are going to have to duct tape that plastic along the fucking wall.

MANDELL:  Okay.

ENGEL:     We don't want none of the splatter going up and soaking into the brick.

MANDELL:  But probably before I leave, or right after I leave cover him up, because he is going to see this shit.  And you start – This looks like a, a butcher shop.

ENGEL:     No,  what I'm saying –

MANDELL:  Don't let him have a stroke or heart attack.

ENGEL:     No, after he's done, he's down, choked out.

MANDELL:     Yeah.

ENGEL:       WE got to tape up plastic, all the way up to that pipe.

                          ****

ENGEL:       And just let it drop, and let it hand over this panel, and over the sink and over the panel.

MANDELL:     But if you don't want him to have a heart attack –

ENGEL:       That (inaudible) everything splatters –

MANDELL:     -- you can turn him around and –

ENGEL:       I know, no I ain't talking about that.

                          ***

ENGEL:       But we won't splatter.

MANDELL:     Right.

ENGEL:       Cause if it goes into that fucking brick, we'll never get it out.

(*Id*. at 28-29.) Mandell also tells Engel that "if this looks like he's not giving up things correctly, then we'll put him to seep with pills. If, if, that's even doubtful though. I got all that, ah, what do you call? Ambiens." (*Id*. at 38.)

On October 25, right before Mandell and Engel depart to abduct Campbell, they discuss with excitement torturing him by using a razor blade on his genitals:

MANDELL:     And if he's in the dark … like this, he couldn't even try any – I mean, it's really, I'm just talking out, there's nothing to do. Darkness is a motherfucker, up to here. He can breathe. I know you are going to play with his fucking dong. Right? Huh? You going to put a little blade there?

ENGEL:       You never know. He might come out –

MANDELL:     What are you going to tell him?

19

| ENGEL: | -- with a split weeny. |
|---|---|
| MANDELL: | Are you going to do the good guy, bad guy? |
| ENGEL: | … putting that blade right up against the center, and just start--- |
| MANDELL: | I can feel it. |
| ENGEL: | And you just start slicing down the middle. It's like slicing a banana split. You know what a banana split looks like? |
| MANDELL: | Ohhh. |
| ENGEL: | You don't have to worry about pissing. |
| MANDELL: | Ohhh. |
| ENGEL: | To aim. Because it's just going to go (sound effect). Take that urethra right down the middle. (Sound effect). |
| MANDELL: | Just be conscious of his heart. Oh – I am going to tell him: "You got medication at, at your house? Is there medication you need? Are you diabetic?" Well, you can try that if, if you're not having the results within an hour and he's already been blindfolded and ah. |

(*Id*. at 51-52.) As they are getting ready to leave, Engel loads the firearm. Mandell asks him "Why are you loading up?" When Engel questions why they would "have it sitting around here unloaded," Mandell tells him "good answer." (Tr. 545.). Once they are dressed, Mandell says "Let's roll" and they head to Michael's office in the Crown Victoria. (Gov. Ex. 5308 West Devon 10/25/2012 Transcript at 55.).

### C.    The Arrest of Defendant and Co-Defendant Engel

When Mandell and Engel departed Club Med at 5308 West Devon, FBI surveillance agents observed them depart the area of 5308 West Devon and travel toward Michael's office where they thought they were meeting their victim, Steven Campbell. The agents observed them

at approximately 6 pm that evening travel to the alley behind Michael's office. The FBI Agents then arrested Defendant Mandell and co-defendant Engel.

Special Agent Sean Burke, a member of the FBI's Special Weapons and Tactics ("SWAT") team, testified that his SWAT team assisted in the arrest of Defendant in the alley near Michael's office on October 25, 2012. Agent Burke explained to the jury how they took Mandell into custody after he resisted arrest and claimed to be a police officer. Agent Burke's role in the arrest was "to approach the front passenger side and arrest the passenger" in the vehicle. (Tr. at 657.) Defendant was the passenger in the vehicle, a 2004 white Chevy Crown Victoria. (*Id.* at 663.)

The FBI used a "flash-bang" for diversion after the agents surrounded the vehicle. Agent Burke and three other agents approached the passenger side of the vehicle. They instructed Defendant to put his hands up and announced they were the FBI. Defendant did not comply with the instructions. (*Id.* at 662-63.) When he continued to refuse to comply with the instructions, one of the FBI agents broke out the window of the vehicle with the front barrel of his rifle that had a glass breaker on it. (*Id.* at 663.) Defendant eventually put his hands up but would not comply with the instruction to exit the vehicle. Defendant Mandell then told the Agents that he was a police officer. (*Id.* at 664.) He still remained in the vehicle, and Agent Burke and Agent Hickey subsequently had to pull him from the Crown Victoria. (*Id.*) Once they removed him, Defendant resisted them and again told them "once or twice" that "he was a police officer." (*Id.* at 665.) The Agents ultimately handcuffed Defendant. (*Id.*)

The agents searched Defendant and found "black gloves, a flashlight, a pistol called a BB gun – Airsoft BB gun – out of one of the front pockets of his jacket." (*Id.* at 666; 738-45; Gov. Exs. Mandell 4, Mandell 5, Mandell 6-A, 6-B, 6-C, Mandell 10.) Defendant also had a lanyard

around his neck with a Cook County Sheriff's identification and had a Deputy Sheriff Cook County badge on him.  (Gov. Exs. Mandell 2, Mandell 3.)  The fake identification contained Defendant's photograph and the name "Robert Johnson."  (Tr. at 736-37, 779-80.)  Defendant also had a phony arrest warrant on his person at the time of his arrest.  (Tr. at 742; Gov. Ex. Mandell 8.)  The arrest warrant, which contained the logo of the Cook County Sheriff's Police, contained the name of "Steven Campbell" as the person who was supposed to be arrested.  (Tr. at 742-43.)  The arrest warrant notes that Campbell was "under federal grand jury indictment" and he was to be brought "before any U.S. Magistrate in the Northern District of Illinois – Eastern Division."  It also contains the purported signature of the "Honorable James J. Zagel[5]."  (*Id.* at 743; Gov. Ex. Mandell 8.)  United States District Court Courtroom Deputy Supervisor Theresa Hammonds testified that the arrest warrant was not an authentic federal arrest warrant.

Another team of FBI agents simultaneously removed co-defendant Gary Engel from the driver's side of the Crown Victoria.  He had an identification card from the Chicago Police Department containing his photograph and name.  (Tr. at 745; Gov. Ex. Engel 1-A).  Engel also had an identification card with his photograph indicating that he worked for the Willow Springs Police Department.  (Tr. at 745; Gov. Ex. Engel 1-B.) In addition, the FBI recovered from Engel a stun gun tool, a pair of Smith & Wesson handcuffs, a Cook County deputy sheriff badge, a United States Marshal badge, a United States Marshal identification card with the name Deputy U.S. Marshal Gary Engel, an empty Ziploc bag, and a weapon that could fire a projectile. (Tr. at 745-49; Gov. Exs. Engel 2, Engel 3, Engel 4, Engel 5, Engel 6, Engel 7.)  The identifications were fake.  (Tr. at 784-87.)  The evidence also revealed that Mandell had purchased handcuffs

---

[5]  The distinguished United States District Court Judge James Zagel is James B. Zagel.  (Tr. at 767-68.)

from the Chicago Uniform Company on October 24, just one day before he intended to "arrest" his victim Campbell.

### D. Search of Club Med

After the FBI Agents arrested Defendant and Engel, they executed a search warrant at Club Med. Defendant's assertion that supporting "physical evidence was lacking" is belied by the extensive physical evidence recovered by the agents that corroborated Defendant's discussions with Engel. (R. 243, Reply at 3.) The agents located and seized all of the instrumentalities of the extortion and torture plot that Defendant Mandell and co-defendant Engel openly discussed at the Club Med location, as well as some of the items about which Mandell bragged to Michael. Special Agent David Ostrow, a member of the FBI Evidence Response Team ("ERT"), photographed the location before the search commenced. (Gov. Ex. Devon Photos 3, 4, 6, 7, 8, 10-25, 32, 34, 35-44, 46, 49, 50, 52-58, 61-63, 68-69.) He also testified that he recovered a metal pry bar and a box of "48-inch Heavy Duty Ties." (Gov. Exs. Devon 60, 51.)

Special Agent Trautmann also testified about the items recovered during the search of Club Med. (Gov. Exs. Devon 1-5, 7, 8, 10-12, 14, 18, 23-28, 30-33, 36-39, 44, 48, 50, 54, 65, 77.) During the execution of the search, the agents seized the tools of Defendant's plot and the instruments of death. Specifically, they seized the implements for restraining Campbell, including a wheelchair and zip ties. They recovered large plastic sheets in a large roll directly adjacent to the sink. (Tr. at 897; Gov. Ex. Devon Photo No. 40). They also seized a box of Hefty "extra large trash bags, heavy duty cleanup bags", a brief case containing power cords, cell phones, walkie-talkies, and a spy camera. (Tr. at 897-901; Gov. Ex. Devon 5, 12, 14, 31, 32.)

The agents also seized a Ruger .22 caliber semi-automatic pistol which was loaded with 8 rounds of ammunition,  (Tr. at 902-03, 905; Gov. Exs. 54, 7, 10.)  This is the firearm Defendant and Engel discussed on the FBI wiretap.  The agents found the firearm inside a sock on the counter next to the sink.  (Tr. at 902.)  The agents also recovered two boxes of ammunition next to the firearm that corresponded with the model and caliber of the weapon.  (*Id.* at 902-03.)

In addition, Agent Trautmann testified that they recovered rubber gloves, new utility gloves, one bag of Chlorox disposable gloves, one bag of Chlorox Premium Choice gloves, plastic goggles, a knife on top of the butcher block, a meat cleaver, and a 55 gallon garbage container.  (*Id.* at 905-11; Gov. Exs. Devon 39, Devon 28, Devon 5, Devon 18, Devon Photo 55, Devon 77.)  They found a butcher block with a hemostat next to it.  (Tr. at 907; Gov. Ex. Devon 40.)

While executing the search warrant, the agents also seized a man's razor and a box with Smith & Wesson handcuffs written on it.  (Tr. at 917, 923-24.)  They also recovered a ski mask, an eye bolt, a small hand saw, a military flight suit, and several large saws.  (*Id.* at 943, 949-56; Gov. Ex. Devon 42, 6, 43, 56, 62, 69.)

In short, the FBI recovered the tools of Defendant's scheme from 5308 West Devon.  The agents recovered the instrumentalities Defendant discussed using and intended to use to carry out his scheme.  This evidence corroborated Defendant's statements captured through the wiretaps and his conversations with George Michael.  The government presented overwhelming evidence to convict Defendant of Counts One through Six of the Superseding Indictment.

**II.    The Court Did Not Err in Denying Defendant's Motion to Suppress the Use of the Wiretaps**

Defendant contends that the Court erred in denying his motion to suppress the Title III interceptions.  In connection with its investigation in this case, the government submitted two applications to then-Chief Judge James Holderman for authorization to intercept oral communications and visual, non-verbal conduct at Club Med.   One application was for the interception of oral communications at the Club Med and one was for the interception of visual, non-verbal actions taken at the same location.  FBI Special Agent Richard Tipton was the affiant on both affidavits submitted in support of the applications.

Prior to trial, Defendant moved to suppress the evidence obtained from these Title III wiretaps on the grounds that the government failed to establish necessity for the wiretap. Defendant further argued that due to the lack of necessity for the wiretap, Agent Tipton knowingly omitted various facts from the affidavits in support of the wiretaps.  The basis for Defendant's motion to suppress was his assertion that the FBI knew that Gary Engel was Defendant's accomplice in the alleged charges when Agent Tipton submitted the affidavits to then-Chief Judge Holderman, yet Agent Tipton withheld this information in order to claim that the government needed the wiretaps in order to determine the identity of Mandell's accomplice in the alleged crimes.

The government must satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c) in order to obtain a wiretap.  In order to comply with the necessity requirement, the government's application must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. 2518(1)(c).  *See United States v. Durham*, 766 F.3d

672, 679 (7th Cir. 2014). As the Seventh Circuit has explained, the necessity requirement "was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are 'not to be routinely employed as the initial step' in a criminal investigation." *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006), quoting *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991). *See also United States v. Long*, 639 F.3d 293, 301 (7th Cir. 2011). "Hence, the government's burden of establishing necessity is not high." *Long*, 639 F.3d at 301, citing *United States v. Campos,* 541 F.3d 735, 746 (7th Cir. 2008). As the Seventh Circuit recently reiterated, "[t]he statute does not require the government to show absolute necessity…; the point is to ensure that wiretaps are not used routinely as the first step of an investigation." *Durham*, 766 F.3d at 679 (citing *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991)).

In assessing Defendant's motion to suppress, the Court thoroughly reviewed both of Special Agent Tipton's 50 page affidavits submitted in support of the wiretaps, and found that the government had demonstrated the necessity of the wiretaps as required in Section 2581(1)(c). The Court thoroughly addressed the arguments presented in Defendant's motion to suppress and concluded:

> As Agent Tipton disclosed in his supporting affidavit, the necessity for the wiretap was premised on the need to identify Defendant's conspirator and establish his guilt in the crime:
>
> I believe that the interception of oral communications, as well as visual, non-verbal conduct, is the only available technique with a reasonable likelihood of securing the evidence necessary to ascertain the identity of, and prove beyond a reasonable doubt the guilt of, the participants and co-conspirators engaged in the Subject Offense described herein. Such persons include the individual that MANDELL has identified as his "associate" who will take custody of [Victim One] at the Target Location after [Victim One] is abducted, and who will dispose of [Victim One's] dead body. Although normal investigative procedures have been successful in initiating this investigation, these investigative procedures have been tried and failed, or reasonably appear to be unlikely to

succeed if continued further or tried, or are too dangerous to employ in achieving all the objectives of the investigation.

(Affidavit at ¶ 45.)  The affidavits make clear that the agents extensively and arduously investigated this case, but needed the wiretaps to identify and establish evidence against Defendant's accomplice in the charged scheme targeting Victim One.  The affidavit properly disclosed that the necessity for the wiretap was to identify Defendant's accomplice in the charged crimes.  Viewing the government's requirement to exhaust normal investigative procedures in a "practical and common-sense fashion," the government has met its burden of establishing necessity in the affidavits supporting the wiretaps.  Accordingly, the Court denies Defendant's motion to suppress.

(R. 127, Ruling on Motion to Suppress at 13-14.)

It is well settled in the Seventh Circuit that necessity for a wiretap is demonstrated where investigators are "having trouble fingering other members of the conspiracy." *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991).  *See United States v. Long*, 639 F.3d 293, 301 (7th Cir. 2011); *McLee,* 436 F.3d at 763 ("The government's demonstrated need for a wiretap as a means of identifying all coconspirators and the roles they occupied in the structure of the conspiracy is sufficient for a finding of 'necessity' under the statute"); *Fudge,* 325 F.3d at 919 (rejecting argument that "evidence of a specific individual engaging in a criminal activity obviates the need for" a wiretap, since "the government used the wiretap for a number of reasons, not the least of which was to obtain more incriminating evidence. We do not find such a basis problematic.").  In addition, as described in the Court's ruling, "[f]ar from asking for a wiretap after little conventional investigation, the government first used a variety of other techniques to gather information." *Durham*, 766 F.3d at 680.  The government was not able to identify Defendant's accomplice through its extensive investigative efforts, thus the government established necessity.  Defendant fails to identify any error committed by the Court.

Moreover, the evidence at trial confirmed that neither the government nor Michael knew Engel's identity when Agent Tipton submitted his affidavits in support of the wiretaps.

Defendant even told Michael during a recorded conversation that he would never know the identity of his associate. This evidence further supported the necessity of the wiretaps.

Defendant also claims the agent's affidavit contained material omissions regarding Engel that required a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In order to obtain a *Franks* hearing, Defendant had to make a "substantial preliminary showing" that 1) the agent omitted a statement from the affidavit; 2) the statement was omitted for the specific purpose of misleading the issuing judge or with reckless disregard as to whether it would mislead the issuing judge; and 3) the omitted information was material to the judge's determination. *Id.* at 155-56. Defendant failed to meet this burden. .) In essence, the fact that the affidavits did not disclose Defendant's involvement with Engel regarding the crimes charged in Counts Seven and Eight does not require a Franks hearing. The Court addressed Defendant's arguments in detail in its December 2, 2013 Memorandum Opinion and Order, and incorporates that ruling herein. (R. 127Defendant has failed to identify any basis for error in that ruling.

## III. Defendant Has Failed to Identify Any Errors That Require a New Trial or Judgment of Acquittal

Defendant further claims that the Court committed multiple errors at trial that require a new trial or a judgment of acquittal. The Court will address each argument in turn.

### A. The Court Did Not Err in Its Evidentiary Rulings Regarding George Michael, the Government's Cooperator

Defendant asserts that the Court erred in several of its Rule 608(b) rulings regarding George Michael. Rule 608(b) provides as follows:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

> **(1)** the witness; or
>
> **(2)** another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b).  Rule 608(b) allows a court to permit cross examination of a witness about specific instances of conduct "if they are probative of the [witness's] character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b).  As the Seventh Circuit teaches, "[t]he rule is permissive, not mandatory, leaving the court with great discretion."  *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 778 (7th Cir. 2013).  The scope of the cross examination remains subject to Federal Rule of Evidence 403.  *Id.*  Indeed, courts have "wide latitude" regarding the scope of cross examination.  *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012).

In advance of trial, the parties raised issues with the Court regarding the scope of the cross examination of the government's cooperator, George Michael.  The Court permitted Defendant to extensively cross examine Michael.  (R. 175, Memorandum Opinion and Order.)  The Court also limited certain areas of cross examination pursuant to the Federal Rules.  (*Id.*)  Defendant now claims that the Court erred in certain rulings.

Defendant first challenges the Court's decision to not permit him to inquire about an unauthorized recorded call Michael made to Mandell shortly before the FBI arrested Mandell.  As the Court ruled:

> Defendant next seeks to cross-examine[6] George Michael regarding an illegally recorded call he made, unrelated to this case.  Specifically, he made a recorded telephone call without obtaining authorization from the FBI even though the FBI previously had instructed him not to make such unauthorized recordings.  In response, the government argues that recording a telephone call without prior approval is not an act that bears upon the truthfulness of the witness thus it is not a proper area of inquiry under Rule 608(b).

---

[6]  Defense counsel moved away from this position to some extent at a side bar on January 30, 2014.  For the sake of completeness, the Court will address the issue here.

Rule 608(b) requires that the conduct at issue bear on truthfulness. *United States v. Abair*, 746 F.3d 260, 264 (7th Cir. 2014). The call at issue here does not. Defendant has not established any basis for error.

Defendant next claims that the Court improperly prevented him from impeaching George Michael on the grounds that he allegedly failed to accurately report income to the IRS. The Court precluded Defendant from raising this issue on cross examination because the statement was made to law enforcement in 2005 and was never corroborated. Given the age of the conduct and the fact that it was not verified, Defendant is hard-pressed to argue that this was an error.

In addition, Defendant has failed to identify any potential prejudice that the exclusion of this uncorroborated, nine year old alleged conduct caused, especially in light of his extensive cross examination of George Michael. *United States v. Thomas*, 510 F.3d 714, 721 (7th Cir. 2007). Moreover, Defendant extensively cross examined Michael regarding many substantive areas, including 1) the negative credibility findings of an Administrative Law Judge ("ALJ") against Michael in a hearing involving the FDIC's lawsuit against Michael and his brother in connection with a bank they owned; 2) an ALJ's adverse credibility findings against Michael involving a religious tax exemption Michael claimed on his home, as well as Michael's involvement in the exemption; 3) Michael's involvement in multiple allegedly fraudulent transactions; and 4) the fact that Michael did not record all of his calls with Defendant. During this time, the jury had more than ample opportunity to observe Michael's credibility. This extensive cross examination provided Defendant with a full opportunity to probe and expose any infirmities in his testimony and to challenge his credibility. *See United States v Fuller*, 532 F.3d 656, 665 (7th Cir. 2008) (affirming district court's limit on certain irrelevant cross examination, especially where defense counsel cross examined cooperating witness on extensive other

areas); *United States v. Muhammad,* 928 F.2d 1461, 1467 (7th Cir.1991) ("Limitations on cross-examination do not interfere with the defendant's Sixth Amendment rights provided that cross-examination was sufficient to enable a jury to evaluate [the defendant's] theory of defense and to make a discriminating appraisal of the witness's motives and bias").

### B.    Defendant's "Innocent Possession" Jury Instruction Was Not Proper

Defendant next contends that the Court erred when it rejected his proposed jury instruction number two because it deprived him of a fair trial on Counts Four and Five. Counts Four and Five charged Defendant with possessing a firearm in furtherance of a crime of violence and being a felon in possession of a firearm. Both counts pertained to the firearm seized from Club Med. Defendant's Proposed Jury Instruction No. 2 provided as follows:

> It is a defense to the charge of unlawful possession of a firearm that the defendant's possession of the firearm constituted innocent possession.
>
> Possession of a firearm constitutes innocent possession where:
>
> 1.    The firearm was obtained innocently and held with no illicit purpose; and
>
> 2.    Possession of the firearm was transitory, i.e., in light of the circumstances presented there is a good basis to find that the defendant took adequate measure to rid himself of possession of the firearm as promptly as reasonably possible.
>
> If you find that the defendant possessed a firearm specified in Count 5 and that possession constituted innocent possession, you should find the defendant not guilty of Count 5.

(R. 187, Defendant's Proposed Jury Instructions at 9.)

The Seventh Circuit has not recognized the "innocent possession" defense in a felon in possession charge. *United States v. Jackson*, 598 F.3d 340, 349 (7th Cir. 2010). Furthermore, the Seventh Circuit has noted that "if we were to adopt a distinct 'innocent possession' defense, two requirements would have to be satisfied to trigger it":

The record must reveal that (1) the firearm was attained innocently and held with no illicit purpose and (2) possession of the firearm was transitory- *i.e.,* in light of the circumstances presented, there is a good basis to find that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible. In particular, a defendant's actions must demonstrate both that he had the intent to turn the weapon over to the police and that he was pursuing such an intent with immediacy and through a reasonable course of conduct."

*Id.* at 350 (quoting *United States v. Hendricks,* 319 F.3d 993, 1007 (7th Cir. 2003) (internal quotations omitted)). "Where a Section 922(g) defendant does not immediately seek to turn a firearm over to law enforcement, an innocent possession instruction is not warranted." *Jackson*, 598 F.3d at 350. Here, there was no evidence at trial that Defendant Mandell took any actions, much less immediate ones, to turn the firearm over to law enforcement. Indeed, the video evidence revealed Engel loading the firearm with Mandell present while they were at Club Med getting ready to carry out their extortion and torture plot. Mandell asked Engel why he was loading the gun, and Engel responded "[W]hy … have it sitting around here unloaded?" (Gov. Ex. 5308 West Devon 10/25/12 Transcript at 53-54.) Mandell responded, "Good answer." *Id.*

The Court's refusal to give Defendant's innocent possession instruction was consistent with the law in this Circuit and the facts in the case. Accordingly, the Court did not err in its ruling.

### C. Defendant's Additional Undeveloped Arguments Fail

Defendant lists fifteen additional alleged errors that he claims require a judgment of acquittal or, in the alternative, a new trial. Specifically, Defendant claims that a judgment of acquittal and/or a new trial is warranted based on: 1) Defendant's placement in solitary confinement during his pre-trial period of incarceration; 2) the media coverage in the case; 3) the courtroom security during trial; 4) the "confusing" nature of the jury instructions; 5) one juror's "language issues"; 6) the quashing of a subpoena for the records of the Highland Park Police

Department; 7) alleged discovery violations; 8) failure to produce certain discovery; 9) failure of

the FBI to generate reports concerning other dealings with the victim; 10) the FBI's failure to

record certain calls between Michael and Defendant; 11) the government's improper closing

arguments; 12)  the FBI's "failure to redact the tape transcripts of unduly prejudicial

conversations" between Defendant Mandell and George Michael; 13) the FBI's failure to

generate and produce a report of a July 18, 2012 conversation between Defendant and Michael;

14) the failure to produce discovery regarding Defendant and Michael's initial meeting; and 15)

the "collective and cumulative effect of the aforementioned errors."

       As an initial matter, Defendant has not developed these arguments.  He has failed to

provide any analysis and thus has waived them.  The Seventh Circuit has made clear that

undeveloped and merely perfunctory arguments like this are waived.  *See United States v.

Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) (finding that arguments "without discussion or

citation to pertinent legal authority" in opening brief were waived); *United States v. Hassebrock*,

663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and

therefore waived"); *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said

numerous times, undeveloped arguments are deemed waived[.]") (internal quotation marks and

citation omitted).  *See also Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("Merely reciting

the Rule 59(a) standard and then tossing the motion into the court's lap is not enough.  Failure to

adequately present an issue to the district court waives the issue on appeal").  In the interests of

completeness, however, the Court will address each alleged error in turn to the extent possible.

In addition, the Court incorporates by reference its prior rulings on these issues.

### 1.      Solitary Confinement

Defendant argues that he was denied a fair trial because he was housed in the Special Housing Unit ("SHU") in solitary confinement at the Metropolitan Correctional Center ("MCC") for the majority of his 15 month pre-trial detainment.  He claims that the "inhumane nature of solitary confinement and the debilitating effect on his psyche interfered with his pre-trial preparation and ability to get a fair trial."  (R. 206 at 7.)

Defendant has failed to offer any evidence that he suffered from psychological problems resulting from his incarceration in the SHU.  In addition, during the course of his confinement and prior to trial, Defendant never argued or submitted proof that incarceration in the SHU was impacting his psychological well-being.  Furthermore, the Court observed Defendant carefully throughout the two week trial, including during his testimony.  The Court did not observe any indication that he was suffering from psychological problems caused from his incarceration at the SHU.

In addition, Defendant's conditions at the SHU did not interfere with his ability to prepare for trial.  Indeed, the MCC provided Defendant with significant resources to assist in his trial preparation.  They provided him with a personal laptop computer to review the recordings and other evidence in this case.  He had access to the laptop during the majority of his confinement in the SHU.  As the Court noted at the March 26, 2013 status hearing, he used the laptop thirty-two times between January 4, 2013 and February 26, 2013 for an average of six hours at a time.  In addition, Defendant had access to the laptop in his cell for ten hours a day for the three month period prior to trial.  Based on the Court's experience, the MCC provided him with more computer resources to prepare for trial and review the Title III materials than other

inmates at the MCC who are housed in the general population. During his trial testimony, Defendant even conceded that he had reviewed the recordings "hundreds" of times.

Defendant also had access to the law library. As the Court noted at the March 26, 2013 status hearing, Defendant entered the SHU on November 1, 2012. Between November 25, 2012 and March 19, 2013, he used the law library 40 times for an average of two hours each time. He also had access to the law library and went there more than 70 times before trial commenced. Defendant also wrote a letter to "Jennifer" on September 9, 2013, and admitted the significant amount of time and ability he had to prepare for his trial in the SHU:

> I am working on my trial preparation everyday. And actually I am better off in solitary as opposed to the general population crowd – who do <u>not</u> work on their case – and are busy snooping on other people's cases. [Frowning fact depicted]. Miserable people here. Rats desperately trying to get out at any & all costs. Rats biting rats. Sorry – but true. I am, one of THREE <u>only</u> persons here – that literally works on his case every single day. My lawyers are amazed.

 (R. 247 at 4-5) (emphasis in original). By his own admission, Defendant's pretrial preparation was hardly impaired by his housing in the SHU.

### 2. Media Coverage

Defendant also contends that the "unrelenting" media coverage, which included information about his background, tainted the jury. This assertion is completely baseless.

The media covered Defendant's trial, which included pretrial coverage. At the beginning of jury selection, the Court had each member of the venire complete a jury questionnaire. Question 18 of the questionnaire asked:

> This case involves allegations that Defendant Steven Mandell (formerly known as Steven Manning) participated in a scheme to kidnap his victim, force him to turn over money to him, then kill his victim. The case has generated some newspaper and TV coverage. Do you recall seeing or hearing any of this coverage? If so, please describe briefly what you recall.

(R. 183, Jury Questionnaire.)  Question 19 asked the following:

> I will be instructing that you must put information you may have seen outside the courtroom (including any media coverage) out of your mind, and make a decision based solely on what you see and hear in this courtroom.  Will you be able to follow this instruction?  If not, why not?

(*Id.*)  The answers to these questions helped the Court and the parties assess a juror's fitness for jury duty.  The Court then carefully questioned each member during voir dire about any exposure to the media in the case and about his or her ability and duty not to watch, read or listen to any media coverage about the case.  Where necessary, the Court followed up on a prospective juror's answers to questions 18 and 19 on the questionnaire.  The Court carefully gauged the jurors' demeanor and credibility while questioning them.  *See Skilling v. United States*, 561 U.S. 358 (2010) (questionnaire and follow up questioning of prospective jurors was sufficient).

Furthermore, once the jury took the oath, the Court instructed them as follows regarding media coverage:

> I do anticipate this case is going to get some media coverage.  It is not unusual in this building for cases to get media coverage.  But you must not read any news stories or articles or listen to any radio or television reports about the case or read anything on the Internet about the case or about anybody that has anything to do with this trial.
> It is very important that you follow that instruction.  I am not telling you not to watch the news or not to read the newspapers.  If you want to do that, that is fine.  You just cannot read anything about this case or listen to anything about this case.

After the Court also instructed them not to conduct any independent research about the case, it explained the reasons behind these instructions:

> And the reason is, I will tell you, again, what we 1  talked about this morning.  You do not know if what you find on the Internet is true.  It might be completely wrong and then you get something in your head that is completely wrong.  Also, it is very important, and it is very important to the individuals before you, that you decide this case based solely on the evidence presented in the courtroom.  And you have taken an oath to do that, ladies and gentlemen.

> If you look at something outside of the courtroom, we do not know what you have looked at. So, we do not know how to address something if you look outside. It is completely unfair to everybody in the courtroom.
>
> \*            \*            \*
>
> Another reason, ladies and gentlemen, that you do not need to watch any news coverage or listen to any news coverage, you have a front row seat. You know what is going on in this courtroom. So, there is no need for you to follow any coverage about this case.

In addition, at the end of each trial day, the Court instructed the jury not to watch, read or listen to any of the media coverage on the case. It is presumed that jurors follow a court's instructions. *See United States v. Jones*, 763 F.3d. 777, 809 (7th Cir. 2014); *United States v. Adkins*, 743 F.3d 176, 186 (7th Cir. 2014). Defendant has not presented anything to rebut this presumption.

As the Supreme Court has noted, "juror *impartiality* … does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 380. "[P]retrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Id.* at 384 (citations and quotations omitted). *See also United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013). While the media covered this case during the trial, there is no evidence that it produced any prejudice. Indeed, Defendant never expressed any concerns during the trial about a particular juror being exposed to media coverage and never asked the Court to poll the jury about whether they had seen any media coverage. In essence, Defendant has no basis to contend that the media coverage denied him the right to a fair trial.

Finally, the jury acquitted Defendant of two counts. The acquittal reinforces that the jury was not prejudiced by any media coverage as Defendant contends. *Skilling*, 561 U.S. at 383-84. Defendant has failed to establish this claim.

### 3. Courtroom Security

Defendant complains that the courtroom had "[e]xcessive and openly visible courtroom security" which "suggested a danger from Mr. Mandell which prevented a fair trial in this case." (R. 206 at 7.) Defendant is wrong.

Defendant remained in custody during trial. Throughout the trial, two United States Marshals Service's Deputies remained in the courtroom. The United States Marshals follow this procedure in criminal trials where a defendant is in their custody. Indeed, "[c]ourtroom security is necessary during a trial for a crime of violence." *Stephenson v. Wilson*, 619 F.3d. 664, 672 (7th Cir. 2010). The Deputies assigned to this case remained professional throughout the trial. They wore suits rather than United States Marshals' uniforms, they were unobtrusive, and they never took any actions in front of the jury suggesting that Mr. Mandell was a danger.

Significantly, Defendant only raised one issue with respect to the Deputies during the course of the trial. He never claimed that the security was excessive or suggested a danger from Mr. Mandell to the jury. He never objected to the presence of two Deputies. He never complained regarding the conduct of the Deputies. Instead, Defendant only made one comment regarding the Deputies. Specifically, when Defendant elected to testify, both Deputies sat at the front of the courtroom near the back door. Defense counsel commented, in a joking manner, as follows:

COUNSEL:    Your Honor?

THE COURT:  Yes.

COUNSEL:    Do we need two marshals sitting over in the corner?

THE COURT:  Yes, they will be sitting over there.

COUNSEL:    Both of them?

THE COURT: Both of them, yes.

COUNSEL:  The one looks pretty big, Judge.
(Laughter.)

THE COURT:  That is noted for the record, Mr. Spielfogel.

(Tr. at 1337.)  Defendant did not object to their presence or ask the Court to take any action.

Trial judges have wide discretion in determining appropriate security measures in the courtroom.  *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1991).  *See also Lopez v. Thurmer*, 53 F.3d 484, 493 (7th Cir. 2009).  The presence of the two Deputy United States Marshals in suits rather than uniforms was appropriate given that Defendant remained in custody throughout the trial and given the violent nature of the crimes.  Their presence did not deprive Defendant of a fair trial.

### 4.       The Jury Instructions

Defendant seeks a new trial because the "nature of the jury instructions were confusing and unclear to lay persons, particularly as they go to one's intent and one's state of mind."  As an initial matter, Defendant has failed to identify any specific confusing language in the jury instructions.  His one sentence argument is undeveloped and therefore waived.  *See Beavers*, 756 F.3d at 1059.

"The district court 'is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law.'"  *United States v. Marr*, 760 F.3d 733, 743 (7th Cir. 2014) (quoting *United States v. Gibson,* 530 F.3d 606, 609 (7th Cir. 2008)).  The Seventh Circuit reverses "only if the instructions as a whole do not correctly inform the jury of the applicable law and the jury is misled."  *Id.*  The Court held extensive jury instruction conferences in advance of trial and before

39

instructing the jury.  During the conferences, the Court addressed Defendant's objections to specific instructions.

During deliberations, the jury sent the Court the following note regarding intent:

Judge St. Eve, the jury would like to know the definition of "intent" in regards to Counts 7 and 8.

(Tr. at 1657.)  In response, the Court referred them to the elements instructions for Counts 7 and 8.  (*Id.* at 1660-62.)  Defendant, however, was acquitted on both of these Counts, thus he cannot use this note as a basis for any error.  The jury did not ask any questions regarding "intent" pertaining to the other counts.  Furthermore, Defendant did not object to this language in the instruction, and it is a correct statement of the law.  *See United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008).  Defendant has failed to establish error with respect to the jury instructions.

### 5.      Polling of the Jury

When the jury informed the Court that it had reached a verdict, the Court read the verdict in open court.   The verdict form reflected a verdict of guilty on Counts One through Six, and not guilty on Counts Seven and Eight.  The Court then proceeded to poll the jury.  When the Court asked one of the jurors if this was and is her verdict, she responded, "This is my verdict, but not the last one."  The Court asked the juror, "Did you say 'but not the last one?"  She responded, "Yeah."  (Tr. 1666.)  At that point, the Court had the Court Security Officer immediately remove the jury from the room without continuing to poll the jury.  *See United States v. Carraway*, 108 F.3d 745, 751 (7th Cir. 1997).  Indeed, the "weight of authority suggests that when the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision and not merely because the judge continued to poll the jury." *Id.*

While the parties discussed the appropriate action, the juror sent the following note to the Court:

> Respected, Judge, due to language problem, I didn't understand the sentence of yours. It's misunderstanding. So, please forgive me. I agree with all the things I signed. Thanks.

(Tr. 1673.) The juror signed the note. The Court then brought the jury back into the courtroom and individual polled each juror. At defense counsel's request, the courtroom deputy asked the juror who had indicated "not the last one" the following question – "Is this your verdict on each and every count?" The juror unequivocally responded "yes." (Tr. 1676.)

Moreover, the jury acquitted Defendant on the counts the juror said was not her verdict. As such, Defendant did not suffer any prejudice.

### 6. Subpoena to Highland Park Police Department

Defendant next contends that quashing his subpoena to the Highland Park Police Department deprived him of a fair trial. Defendant, however, fails to explain how this ruling deprived him of a fair trial other than stating that the victim of the crime in Highland Park "had a hostile relationship with the confidential informant." (R. 206 at 8.)

Defendant subpoenaed the Highland Park police department for an investigative file involving an arson. On April 29, 2013, the Court met *ex parte* and *in camera* with defense counsel to obtain an understanding of the relevance of the file. The Court thereafter reviewed the file from the Highland Park Police Department *in camera*. After a careful review, the Court granted the Highland Park Police Department's motion to quash the subpoena because the file was not relevant to this case. The file also did not contain the information about which defense counsel speculated. Furthermore, the investigative file did not pertain to the charges in the case.

41

Defendant appears to suggest that the file had information that he could have used to cross examine George Michael.  Even if the file contained such information (which it did not), Defendant was not deprived of a fair trial because he had extensive material about which to cross examine Michael.  Indeed, counsel spent a substantial amount of time cross examining Michael.

### 7.    Alleged Discovery Violations

Defendant claims that "[d]iscovery violations, including the withholding of agents' notes and eleventh hour production of discovery" deprived him of a fair trial.  (R. 206, at 8.) Defendant's argument fails.

In advance of trial, Defendant moved for the production of the agents' notes in this case. At the September 4, 2013 status hearing, the Court instructed the government to produce the handwritten notes corresponding to the relevant FBI 302 reports in this case for an *in camera* inspection.  The order further required the government to preserve all original notes prepared by law enforcement in connection with this case.  *United States v. Morrison*, 946 F.2d 484 (7th Cir. 1997).  The Court then carefully reviewed the reports and corresponding notes.  After the review, the Court ordered the government to produce a few of the handwritten notes, and found that the remaining handwritten notes were incorporated into the FBI 302's produced by the government. *Id.*

Defendant also claims that the "eleventh hour production of discovery" deprived him of a fair trial.  Defendant, however, fails to identify such a production and fails to articulate how he suffered any prejudice from it.  Approximately one month before trial commenced, the Court addressed in detail at a January 14, 2014 status hearing various discovery issues raised by Defendant as a basis to continue the trial.  After reviewing each request, the Court denied the motion.  Defendant does not identify any alleged error in that ruling.

### 8. Discovery Regarding "Other People"

Defendant next contends that the failure to produce discovery "concerning other people with whom the confidential informant had a hostile relationship" deprived him of a fair trial. The Court carefully considered Defendant's request for discovery regarding other individuals, met with defense counsel *ex parte* and *in camera* to hear why they thought such discovery was relevant, reviewed relevant discovery *in camera*, and ordered the government to produce some discovery. Defendant does not articulate what additional discovery was not turned over and how it prejudiced him. Accordingly, Defendant has waived this argument. *Beavers*, 756 F.3d at 1059 ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

In addition, as noted above, Defendant extensively cross examined Michael. During this time, the jury had more than ample opportunity to observe and assess Michael's credibility. *Fuller*, 532 F.3d at 665. Defendant does not even argue that the discovery regarding "other people" would have had any impact in the case.

### 9. Reports regarding Steven Campbell

Defendant argues that the FBI failed to record or generate reports regarding other dealings with Steven Campbell, the victim in this case. Defendant has not developed this claim, thus he has waived it. *Beavers*, 756 F.3d at 1058. In addition, the Court is not aware of any such dealings with the victim.

### 10. Failure to Record Certain Calls Between Defendant and George Michael

According to Defendant, the "intentional failure by the FBI to record numerous telephone calls between Mr. Mandell and George Michael" deprived him of a fair trial. This one sentence

43

argument in Defendant's opening brief is perfunctory and undeveloped. Defendant also fails to cite any legal authority to support his assertion. He does not identify any evidence to support the assertion or reference any calls at issue. As such, Defendant has waived this claim. *Id.*

### 11. Closing Arguments

Next, Defendant asserts that he is entitled to a new trial because of the government's "improper closing arguments, including but not limited to calling Steven Mandell a hitman." During the course of the rebuttal argument, the government referred to Defendant as a hitman. Because Defendant failed to object to the statements during the closing argument, Defendant must establish plain error. *United States v. Iacona*, 728 F.3d 694, 699 (7th Cir. 2013) (where defendant failed to object during closing argument, court reviews for plain error). In order to meet this standard, Defendant must "establish not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010) (citations and quotations omitted).

The prosecutor made the hitman comment in connection with Counts Seven and Eight of the indictment which charged him with murder-for-hire. The evidence regarding his intent to kill Anthony Quaranta and his wife supported the reference. As the Seventh Circuit recently reiterated, "while calling [the defendant] a "predator" may have been harsh, 'so long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused.'" *United States v. Jones*, 763 F.3d 777, 810 (7th Cir. 2014).

Furthermore, the jury acquitted Defendant on the two murder-for-hire counts. Accordingly, Defendant cannot establish prejudice or that the "proceedings would have been different absent the remarks."

### 12.    The Language in Certain Taped Conversations

Defendant also contends that the Court erred when it declined to order redaction of the tape transcripts of certain conversations that included "improper ethnic and sexual references." The Court reviewed the transcripts in their entirety and addressed Defendant's concerns regarding certain excerpts in a written ruling in advance of trial.  (R. 160.)  The Court incorporates by reference its prior ruling.  Defendant has not identified any basis for err in this ruling.

In addition, the Court admitted small excerpts from the extensive tapes played at trial that Defendant contends were unduly prejudicial. Given Defendant's statements in other recordings that discussed mutilating Mr. Campbell's body parts and chopping him up, Defendant hardly suffered undue prejudice from two relevant statements that were sexual in nature.

### 13.    Report of July 18, 2012 Conversation

Defendant argues that he was denied a fair trial because the government failed to produce a report of a July 18, 2012 conversation between George Michael and Defendant.  The government, however, did produce to Defendant the FBI's 302 that documented this conversation.  (R. 224, REPRT_016_000001.)  As such, this argument fails.

Defendant complains that the FBI did not create this 302 contemporaneously with Michael's meeting and thus he was deprived of a fair trial.  Defendant, however, fails to articulate how or why this deprived him of a fair trial.  He has not made any argument as to what harm he suffered by the FBI's non-contemporaneous documentation of the July 18 meeting or how it prejudiced him.

Defendant received the FBI's 302 (dated January 31, 2014) documenting the July 18, 2012 meeting in advance of trial.  Moreover, defense counsel cross examined Michael about this

meeting and questioned him about the lack of recorded calls between July 18, 2012 (when Michael met Defendant) and August 26, 2012. (Tr. at 513-18.) The jury, therefore, had the opportunity to assess how this information impacted Michael's credibility. Defendant's claim of error fails.

### 14.    The Initial Meeting Between Defendant and George Michael

Defendant asserts that he was further denied a fair trial because the government failed to produce discovery regarding Defendant and Michael's initial meeting. As noted above, the government did produce discovery regarding this meeting and counsel cross examined Defendant regarding it during trial.

Furthermore, Defendant was not the subject of a federal investigation at the time of the July 18 meeting. Defendant has failed to identify any basis for the government to create discovery about a meeting before an individual has become the subject of a criminal investigation.

Defendant also has failed to identify any prejudice from this allegation. Accordingly, his claim fails.

### 15.    There Was No Cumulative Error

Finally, Defendant contends that he is entitled to a new trial based on cumulative error. In order to demonstrate cumulative error, Defendant must establish that "(1) at least two errors were committed in the course of the trial; [and] (2) when considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the [defendant] a fundamentally fair trial." *United States v. Tucker*, 714 F.3d 1006, 1017 (7th Cir. 2013) (citing *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) (citations and quotations

omitted)).  Because Defendant has failed to identify any error, his request is denied.  *See Jones*, 763 F.3d at 811; *United States v. White*, 582 F.3d 787, 805 (7th Cir. 2009).

<u>**CONCLUSION**</u>

For the reasons discussed in detail above, the Court denies Defendant's Motion for Judgment of Acquittal or New Trial.


**DATED:  November 3, 2014**                                    **ENTERED**

_____
AMY J. STUEVE
U.S. District Court Judge